In re WORLD ACCESS, INC.,
et al., Debtors.

R $^2$ Investments, LDC, Plaintiff,

v.

World Access, Inc., WA Telcom Products Co., Inc., WorldxChange Communications, Inc., Facilicom International LLC, World Access Telecommunications Group, Inc., Defendants.

Bankruptcy No. 01 B 14633.
Adversary No. 01 A 01219.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Oct. 3, 2003.

James H.M. Sprayregen, Reed S. Oslan, and Timothy D. Elliott, Kirkland & Ellis, Chicago, IL, for R $^2$ Investments, LDC.

Mark K. Thomas, Jenner & Block, Ronald S. Betman, Dawn M. Canty, and Nicole Nehama Auerbach, Katten Muchin Zavis Rosenman, Chicago, IL, for World Access, Inc., et al.

John H. Bae and Michael Edelman, Cadwalader, Wickersham & Taft LLP, Harold I. Kaplan, Patrick S. Coffey, and Jeffrey Schwartz, Gardner Carton & Douglas LLP, for Official Committee of Unsecured Creditors.

## MEMORANDUM OPINION

SUSAN PIERSON SONDERBY, Bankruptcy Judge.

This matter is before the Court on the Motion for Substantive Consolidation of Debtors' Estates filed jointly by the Debtors and the Official Committee of Unsecured Creditors (the "Committee"), and on the opposition thereto filed by creditor R $^2$ Investments, LDC ("R $^2$"), joined in by

creditor Daiwa Securities America, Inc. ("Daiwa"). Also before the Court is the Second Amended Adversary Complaint filed by R[2], seeking a declaration (i) that substantive consolidation of the estate of Debtor WA Telcom Products Co., Inc. with the other Debtors' estates is unlawful and inequitable, (ii) that a certain master bank account maintained as part of the Debtors' cash management system is owned by WA Telcom Products Co., Inc., and (iii) that certain sums deposited into the master bank account by Debtor World Access, Inc. constitute capital contributions to WA Telcom Products Co., Inc., and not loans made by World Access, Inc., or alternatively that any intercompany claims arising from such deposits should be equitably subordinated to the claims of outside creditors.[1]

The Court conducted a hearing on the merits spanning four weeks, including testimony from twelve witnesses, as well as designated testimony from the depositions of thirteen additional witnesses, and the introduction into evidence of more than 23,000 pages of exhibits. The Court has reviewed and considered the evidence and, for the reasons set forth below, finds in favor of R[2] on the issue of substantive consolidation but against R[2] as to the master bank account and the deposits therein.

**Background and history of the company.**

World Access, Inc. ("New World Access") is the ultimate parent of the corporate group to which the five Debtors in these jointly administered cases belong. It was created as part of a holding company reorganization in October, 1998, discussed further below. Prior to that reorganization, the ultimate parent of the corporate group was WA Telcom Products Co., Inc. ("WATP" or "Old World Access"). The other three Debtors in this case, i.e., Facilicom International, LLC, World Access Telecommunications Group, Inc., and WorldxChange Communications, Inc., were each acquired after the 1998 reorganization.

Old World Access was formerly known as Restor Industries, Inc., a company which, at least as of 1992, provided repair and refurbishment services for telecommunications products. Restor was publicly traded, and its ticker symbol was "REST."

Sometime in 1995, the company adopted a strategy whereby it would leverage off of its existing customer base by selling some of the same types of telecommunications equipment that it was repairing. In accordance with this strategy, the company acquired a number of corporations that were resellers of telecommunications equipment. Eventually, the company also decided to begin selling its own telecommunications products, and it acquired a number of firms that had their own proprietary technology and telecommunications equipment.

As part of the foregoing evolution, Restor changed its name to World Access, Inc. (i.e., Old World Access) to connote a more global telecommunications business than the repair/refurbishment services associated with the name "Restor." Its ticker symbol was also changed, from "REST" to "WAXS."

1. The Court notes that the filing of the Second Amended Complaint for Declaratory Judgment is not reflected on the docket. However, the Second Amended Complaint was attached to Plaintiff's (R[2]'s) Motion for Leave to File Second Amended Complaint Instanter. That motion was granted on December 11, 2001, and Debtors' Answer to the Second Amended Complaint was filed on January 8, 2002. A separate minute order will be entered deeming the Second Amended Complaint for Declaratory Judgment filed as of December 11, 2001.

In October of 1997, in an effort to raise money for the pursuit of larger acquisitions of companies that had their own telecommunications equipment and technology, Old World Access issued $115 million in 4½% Convertible Subordinated Notes due 2002 (the "Convertible Notes"). The Convertible Notes, when issued, were convertible into common stock of Old World Access.

Shortly thereafter, World Access began a three-phase acquisition of NACT Telecommunications, Inc. ("NACT"), a telecommunications switching company that was publicly traded on the NASDAQ stock exchange. In November and December, 1997, Old World Access purchased NACT shares on the open market and also entered into a stock purchase agreement for the acquisition of approximately 63% of NACT's outstanding common shares. The agreement was ultimately consummated, and World Access then owned approximately two–thirds of the outstanding common stock of NACT. The remaining third continued to be publicly traded.

On February 24, 1998, Old World Access entered into a merger and reorganization agreement with NACT pursuant to which Old World Access would acquire all remaining shares of common stock in NACT through a nontaxable exchange of Old World Access common stock. This transaction was the impetus for the October, 1998 holding company reorganization referenced above, because it was determined that in order for the issuance of Old World Access common stock to be a tax-free event to the shareholders of NACT, Old World Access would have to go through a holding company reorganization. On March 13, 1998, World Access announced that it had entered into the agreement, giving notice of the merger and reorganization to the public.

The October 28, 1998 reorganization led to the creation of a two-tiered holding company structure, with Old World Access merging with a subsidiary (WAXS Acquisition Corp.) of recently created WAXS, Inc. (itself a subsidiary of Old World Access). Once this was accomplished, Old World Access (the surviving entity in the merger with WAXS Acquisition Corp.) became a subsidiary of its former subsidiary (i.e., WAXS, Inc.). Old World Access changed its name to WA Telcom Products Co., Inc. (i.e., WATP), and WAXS, Inc. changed its name to World Access, Inc. (i.e., New World Access). The directors of New World Access were the same as the directors of Old World Access, and New World Access became the new registrant of the WAXS ticker symbol.

As part of the reorganization, a Supplemental Indenture was executed, pursuant to which (i) New World Access fully and unconditionally guaranteed the Convertible Notes and (ii) the Notes became convertible into the stock of New World Access, the new publicly traded holding company, and not the stock of Old World Access, the former ultimate parent of the group.

In anticipation of the holding company reorganization, Old World Access, through its counsel, sought the advice of the Securities and Exchange Commission (the "SEC") regarding the contemplated tax-free exchange. Counsel, in its letter to the SEC, requested that the reorganization be deemed a "succession" for purposes of Rule 12g–3(a) under the Securities Exchange Act of 1934. Counsel notified the SEC that the old registrant (Old World Access) would now be a subsidiary of the new registrant (New World Access) and sought permission to allow the change without the need for a public offering for New World Access. Counsel further requested that Old World Access be allowed

to cease filing periodic reports under §§ 13 and 15(d) of the Exchange Act.

The SEC issued a no-action letter on October 28, 1998, advising that it would not seek enforcement on certain conditions, including that New World Access unconditionally guarantee the Convertible Notes, as referenced above, and that the Exchange Act reports to be filed by New World Access include, *inter alia,* summarized financial information concerning Old World Access.

After the reorganization, Old World Access (i.e., WATP), although a direct subsidiary of the ultimate parent holding company, was itself essentially a holding company, holding investments in its operating subsidiaries. It had no employees, and it shared a general ledger with New World Access. It remained, however, the issuer and obligor on the Convertible Notes that New World Access had guaranteed.

During the process of preparing for the holding company reorganization and the acquisition of NACT, efforts to acquire two other companies were also ongoing. One of these companies was Telco Systems, Inc., a telecommunications equipment provider, the acquisition of which was consummated shortly after the holding company reorganization. The other transaction involved Cherry Communications, Inc., d/b/a Resurgens Communications Group, which was itself, at the time, the subject of a Chapter 11 case in this Court. Cherry Communications was referred to as a carrier's carrier, because it was a wholesaler of long distance traffic, i.e., it carried or "terminated" long distance traffic on behalf of other long distance and local companies. Old World Access had publicly announced its intent to purchase Cherry Communications by means of a press release as well as a public filing in February, 1998. The acquisition did not close until December, 1998, after the holding company reorganization was consummated. Soon thereafter, Cherry Communications was renamed World Access Telecommunications Group, Inc. ("WATG").

As a result of the acquisition of WATG, the World Access companies now comprised two complementary businesses,— the telecommunications equipment group and the telecommunications services group,—which provided complementary services to the same customer base. Following the WATG acquisition and entry into the telecommunications services business, World Access continued to embark on numerous acquisitions and mergers. Certain minor additional acquisitions were made during 1999 to bolster the service side of the business, and then in August, 1999, the acquisition of Facilicom International was announced to the public. Facilicom at that time was a private international long distance carrier, licensed to do business in the United States and in thirteen countries in Europe. It had some small retail operations in Europe, but was primarily a long distance wholesaler. The acquisition of Facilicom was consummated in December, 1999.

Prior to the acquisition, Facilicom had outstanding approximately $300 million in certain 10.5% senior notes. New World Access was required to assume this debt as part of the acquisition, and it did so by exchanging the Facilicom notes for its own 13.25% Senior Notes due 2008 (the "Senior Notes"). The transaction, as an exchange, did not generate any influx of cash for New World Access.

Sometime in the fall or late 1999, in connection with the Facilicom acquisition, it was decided that the equipment companies would be sold and the proceeds used to facilitate growth of the service businesses. Walter Burmeister, a principal of Facilicom who became president of New

World Access after the acquisition, testified that the focus was also going to be on augmenting the group's retail operations.

Long Distance International, Inc. ("LDI NETnet") was a relatively small retail long distance carrier acquired in February of 2000. LDI NETnet operated in nine countries in Europe, and it was acquired with the intent of picking up its existing customer base and expertise in retail.

A much larger acquisition was Worldx-Change Communications, Inc. ("WxC"), one of the Debtors herein. WxC was a telecommunications wholesaler that also had a substantial retail operation, with sales, *inter alia*, in North America, Europe, New Zealand, and Australia. On February 14, 2000, New World Access publicly announced that it had entered into a merger agreement to acquire WxC. New World Access thereafter assumed effective control of WxC pursuant to a Management Services Agreement effective August 1, 2000. The acquisition was actually consummated in December of 2000.

**The bankruptcy filings.**

WxC was the last acquisition New World Access ever made. Although two other acquisitions had been attempted and even announced during the WxC acquisition process,—i.e., Teldafax, a German telecommunications retailer, and Star Telecommunications, Inc.—they never closed. New World Access was petitioned into involuntary bankruptcy in Delaware on April 4, 2001. Approximately three weeks later, on April 24, 2001, New World Access, WATP, WATG, Facilicom, and WxC filed voluntary Chapter 11 petitions in this Court.

By the time of the bankruptcy filings, all of the equipment companies had been sold or wound up except for NACT, the sale of which was consummated post-petition. During the period between the WATG acquisition in 1998 and the filing of the involuntary petition in 2001, the corporate group had developed into an enterprise with over $1 billion in annual revenue and, at its peak, between 100 and 150 subsidiaries.

The involuntary petition was filed by R[2],an institutional investor, together with certain other holders of the Senior Notes (i.e., the notes issued by New World Access in connection with the Facilicom acquisition). The petition was filed after New World Access failed to complete a tender for $160 million of those Notes initiated on January 2, 2001. New World Access had initiated the tender after its sale of Telco Systems, a subsidiary in the equipment business. The Telco sale was one of its largest equipment divestitures, and the sale proceeds had triggered New World Access' tender obligations under the Senior Notes Indenture.

Although R[2], in its capacity as holder of the Senior Notes, was a petitioning creditor in the involuntary case filed against New World Access, it also holds a substantial amount of the Convertible Notes issued by WATP (i.e., Old World Access). In total, it holds approximately $52 million of Senior Notes and $42 million of Convertible Notes, purchased at different points in time in the secondary market, as discussed more fully below. R[2] is, accordingly, a substantial creditor of both New World Access and WATP.

On May 8, 2001, the United States Trustee appointed the Committee in this case. The members are MCI WorldCom, Inc., AT & T Corporation, DDJ Capital Management LLC, First Union National Bank (as indenture trustee), and R[2].

In December, 2001, the Debtors and the Committee filed a Joint Plan of Liquidation and Disclosure Statement, which were amended on February 14, 2002 (as so amended, the "Plan" and the "Disclosure

Statement"). The Plan contemplated the substantive consolidation of all five Debtors. Thereafter, on May 13, 2002, Debtors and the Committee jointly filed their motion for substantive consolidation, which is presently before the Court, together with R[2]'s complaint for declaratory relief, discussed above. Confirmation of the Plan was postponed pending disposition of the motion for substantive consolidation.

R[2], in opposing substantive consolidation of the five Debtors, contends, *inter alia,* that it would receive more on its claims in stand-alone liquidations, that it relied on the separate identity and credit of both New World Access and WATP, holding claims against both entities, and that the separate assets and liabilities of the Debtors in this case can be ascertained without great difficulty, as they maintained separate books and records and regularly recorded intercompany transactions. As indicated above, it also seeks, in its adversary complaint, a declaration that the master bank account is property of WATP, and not of New World Access.

**The Cash Management System.**

The master bank account is part of a centralized cash management system, established by Old World Access at NationsBank (which subsequently became Bank of America) in May of 1998, prior to the holding company reorganization. The system was designed to concentrate funds in a single bank account, designated as the master account, which was established as NationsBank Account No. 3751046297 (the "Master Account"). Funds were collected and disbursed through a series of collection and disbursement accounts, each linked to the Master Account, that were swept every evening to ensure that they retained a zero balance (i.e., "zero balance accounts"). Pursuant to this system (the "Master Account System"), receipts from all U.S. operations, as well as proceeds

from loan or credit facilities, and proceeds from stock sales, asset sales, and other dispositions, were received in the various collection accounts and then forwarded each day up to the Master Account. Disbursements would be made from the various disbursement accounts, and then the funds necessary to cover the disbursements made on any given day would be automatically transferred from the Master Account to the appropriate disbursement accounts (again, ensuring a zero balance at the end of the day).

Michael Mies, who as treasurer of Old World Access established the Master Account System, testified that its purpose was to control cash and centralize the cash process, as well as to maximize investment income by pooling the investable funds. At the end of each day, funds in excess of those needed for the immediate term would be removed to investment accounts, some of which were also linked to the Master Account.

Although the numerous accounts linked to the Master Account changed somewhat over time, e.g., as companies were acquired and divested, the World Access group continued to use this Master Account System, as well as certain other accounts, up through the Chapter 11 petitions. The name on the Master Account, i.e., "World Access, Inc.," did not change during that period, in spite of the holding company reorganization in October, 1998. As discussed above, "World Access, Inc.," which was the name of the publicly traded ultimate parent company when the account was established (i.e., Old World Access, now "WA Telcom Products Co., Inc."), became the name of the new publicly traded ultimate parent company (i.e., New World Access), as part of that reorganization.

Mark Gergel, who was the chief financial officer of World Access, Inc. from 1992 until May of 2000, testified that after the

reorganization, the Master Account was treated as an asset of the new parent company. When asked what happened to the assets of Old World Access at the time of the reorganization, he testified as follows:

> Well, the assets would have consisted primarily of investments in certain operating subsidiaries, and cash and cash equivalents, meaning short-term cash type investments. The cash and cash equivalents would have moved to the parent company because we maintained a centralized cash management system that everything flowed up to the parent company. The investments in the operating subsidiaries would have stayed on the books of WA Telcom Products [i.e., Old World Access] . . . .

(Transcript, at 325–26).

The funds in the Master Account included deposits made by all the U.S. entities. Those entities included not only subsidiaries held indirectly under the second-tier holding company, WATP, but also subsidiaries held directly by New World Access.

The individuals authorized to deal with the Master Account were all employees of New World Access. Those with signature authority (i.e., Michael Mies, Mark Gergel, and Martin Kidder, vice president and controller of New World Access until June of 2000) were also officers and/or directors of both New World Access and WATP. With respect to wire transfers, there were two levels of authority,—approval authority and execution authority. All of the individuals with approval authority were officers and/or directors of both New World Access and WATP, with the exception of

Henry Lyon. Lyon became the New World Access controller in June of 2000 and did not become an officer or director of WATP until after the bankruptcy filing. The individuals with execution authority included several employees of New World Access that had no affiliation with WATP. Again, WATP was a holding company that had no employees after the October, 1998 reorganization.

In addition, New World Access' corporate approval was required to fund any significant operating disbursements from the Master Account. Mark Gergel testified that subsidiaries could not unilaterally engage in transactions in which they took money from the Master Account. He stated:

> [T]hey would have to contact Mike Mies, Marty Kidder, or myself and request cash if it was other than normal check-writing type, you know, paying the bills if you will. If they needed money for special purposes or specific acquisitions or capital expenditures, they would have to come through corporate and get approval, and then we would send them the money or pay the bill for them.

(Transcript, at 338).[2]

In excess of one billion dollars flowed through the Master Account. Virtually all of the deposits into the Master Account were generated either from New World Access or the operating subsidiaries (i.e., Facilicom, WATG, and WxC), as opposed to WATP, with the possible exception of certain cash from the Convertible Note offering left over from the NACT acquisition and certain proceeds from the sale of NACT stock.[3] New World Access alone

---

**2.** R[2] suggests that coming through "corporate" may have meant WATP. It was clear, however, that Mr. Gergel was referring to New World Access, the ultimate parent of all the subsidiaries participating in the cash management system (and only parent of

WxC). Indeed, R[2] has conceded as much. (*See, e.g.,* R[2] response to Debtors' and the Committee's Proposed Finding of Fact No. 180).

**3.** According to R[2] (in its response to Debtors' and the Committee's Proposed Finding of

deposited over $500,000,000 into the account as a result of private placements and other financings or sales. These deposits included $50,000,000 in proceeds from a sale of New World Access preferred stock in 1999, $75 million from an additional sale of New World Access stock in December of 1999, $83 million from a sale of New World Access stock in February of 2000, and approximately $260 million from the sale by New World Access of the stock of its direct subsidiary, Telco Systems, Inc., in April of 2000.

$R^2$'s contention that the Master Account belongs to WATP is based in part on the fact that the federal employer identification number ("FEIN") on the account is that of WATP; it was not changed at the time of the holding company reorganization. $R^2$ also relies on certain agreements entered into between WATP (i.e., Old World Access) and NationsBank at the time the account was established and the fact that those agreements were not transferred to New World Access at the time of the reorganization or thereafter.

Again, the Master Account was established in May of 1998, several months prior to the holding company reorganization. It was assigned the FEIN number for Old World Access, the ultimate corporate parent at that time. The same number, i.e., 650044209, was also automatically assigned to every account established under the Master Account System. WxC accounts opened as late as 2000 were assigned that number even though WxC was never a subsidiary of WATP.

At the time the system was established, Old World Access and NationsBank entered into certain agreements, including a Zero Balance Account Service Agreement (the "ZBA Agreement") and a Customer Agreement for Liquidity Management Investment Account (the "Investment Agreement"). The ZBA Agreement established and governed the zero balance account system, and the Investment Agreement established the account that was an investment vehicle for those funds in the Master Account that were transferred out daily to be invested overnight. While $R^2$ makes much of the fact that these agreements were never assigned or transferred to New World Access, it also stresses that the agreements *prohibited* their assignment or transfer.

As part of the holding company reorganization, Old World Access executed an Assignment and Assumption Agreement (the "Assignment Agreement"), transferring its rights and obligations under certain contracts, agreements, and other documents to New World Access. Neither the ZBA Agreement nor the Investment Agreement were included in the assignment. Mark Gergel, who was the CFO of Old World Access at the time he executed the Assignment Agreement (and became the CFO of New World Access), testified that the agreement was not an assignment of all the assets of Old World Access, but was merely intended to handle certain contracts and other obligations of the company. Attached to the agreement is a schedule that lists the employee benefit plans, contracts with executive officers, and pending acquisition and related agreements that were transferred to New World Access pursuant to the Assignment Agreement.

Michael Mies, who established the Master Account System, testified that there was no document reflecting the assignment of the Master Account from Old World

Fact No. 104), the deposit of left-over cash from the Convertible Note offering was in the approximate amount of $50 million, and the deposit of NACT stock sale proceeds was in the approximate amount of $19 million. The sale of NACT was consummated post-petition.

Access to New World Access at the time of the holding company reorganization, because no need for any such document was perceived; the account was a "World Access, Inc." account before the reorganization and a "World Access, Inc." account after the reorganization. He further explained with respect to the FEIN:

I don't think it occurred to anybody. There was no particular need to change the FEIN number. The FEIN number would typically be used for tax reporting to allocate investment or interest income, for example, to make sure it was reported under the right tax entity. We consolidated for tax purposes. It didn't particularly matter what that [FEIN] number was.

(Transcript, at 805–06)

Indeed, Mies never even noticed that the FEIN on the Master Account was WATP's; he did not know the number "off the top of his head" (or, for that matter, the FEIN's for any of the numerous companies in the corporate group). He learned about the FEIN sometime in April, 2001, after the involuntary petition was filed against New World Access in Delaware. The issue was raised by counsel in Atlanta who had been engaged to respond to the involuntary petition. In the course of preparing responsive documents, counsel noticed that the FEIN on the Master Account did not match the FEIN of the entity against whom the petition had been filed.

Henry Lyon similarly testified concerning the discovery of the FEIN at about the time of the bankruptcy filing.[4] As controller, he was involved in the preparation of the Debtors' bankruptcy schedules. Lyon testified that the Master Account was originally included on the WATP schedules of assets, rather than those of New World Access, because he was under the impression that the FEIN would control as to ownership.[5]

The original WATP schedules also included an exhibit entitled "Bank Account Information," which listed the Master Account as a "World Access/WA Telecom Products" account. In addition, an exhibit to the Statement of Financial Affairs for WATG, filed concurrently with the WATP schedules, referred to an account in the Master Account System (from which officers and directors were paid salaries and expense reimbursements) as "a WAXS [i.e., World Access, Inc.] account bearing the tax identification number of WATP." Finally, in a motion filed by the Debtors on the first day of the bankruptcy case, seeking, *inter alia,* authorization to continue the cash management system (the "Cash Management Motion"), Debtors referred to the Master Account as an account of New World Access. Again, however, they attached the "Bank Account Information" exhibit, referencing it as a "World Access/WA Telecom Products" account.[6]

---

4. Mark Gergel, chief financial officer until May of 2000, also testified that he was unaware of the fact that the FEIN on the account was not changed after the reorganization. He stated that he learned of it after he left the company,—in connection with the hearings currently before the Court.

5. Lyon also prepared disbursements budgets on a weekly basis, which included a footnote indicating that disbursements (i.e., funded from the Master Account) were "funded by

WA Telcom Products Co., Inc." He testified that he referred in the budgets to the Master Account as being owned by WATP in order to be consistent with the schedules.

6. Also attached to the Cash Management Motion as Exhibit B was a disbursements forecast which included the "funded by WA Telcom Products Co., Inc." footnote referenced above. *See* note 5, *supra.*

Michael Mies explained that these varying and inconsistent designations of Master Account ownership after the filing of the petitions stemmed from the confusion and uncertainty generated by discovery of WATP's FEIN on the Master Account. Mies further stated, "I think based on the advice of counsel, we were sort of focusing on form over substance, and that's how it got reflected that way." (Transcript, at 924)

The schedules and statements of financial affairs were ultimately amended, in December of 2001, to reflect ownership of the Master Account by New World Access. The monthly operating statements that had been filed for the period from the Chapter 11 petitions through July 31, 2001 were also amended at that time.

**Management of the Debtors and integration efforts.**

With respect to the substantive consolidation issues, Debtors and the Committee adduced evidence concerning the manner in which the companies were managed and operated prior to the Chapter 11 petitions. The top management team included Jack Phillips and Tod Chmar, CEO and executive vice president of New World Access, respectively. The top team changed over time as new acquisitions were made and other people, such as Walter Burmeister, joined the group. The companies were operated primarily through a series of weekly conference calls of senior management directed by Phillips and Chmar. Senior management included managing directors from the group's European operations, as well as its U.S. concerns. The conference calls addressed operational issues impacting the group as a whole and served to coordinate senior management with respect thereto.

The officers and administrative staff of New World Access, at corporate headquarters in Atlanta, provided the high level, corporate oversight services required for the companies in the group. These oversight services included essentially all of the cash management and treasury functions, insurance functions, tax compliance and reporting functions, and most of the legal functions, as well as administration of payroll for the U.S. companies. The officers and administrative staff who performed these services were employees of New World Access; no portion of their salaries was allocated to the other entities in the group.

The Debtors had overlapping boards and common officers. The New World Access board met approximately quarterly, with occasional additional meetings for special purposes. The boards of the other Debtors did not ordinarily hold meetings; instead, they documented required corporate action through unanimous written consents.

As indicated above, the World Access corporate group developed, during the period prior to bankruptcy, into an enterprise with over 100 subsidiaries. When new companies were acquired, efforts were made to integrate their network operations as quickly as possible. Walter Burmeister was largely responsible for integrating the new networks and operations into the existing networks of the World Access group.

Burmeister explained that a long distance carrier's network includes switches to route the traffic, as well as transmission facilities between the switches. In addition, there are backroom information systems that include the billing system, the service order system, the trouble reporting system, and the systems that route the traffic in the network. By way of illustration, Burmeister described the routing of a hypothetical long distance call, as depicted in Debtors' and the Committee's Demonstrative Exhibit No. 503. In the example, the call was placed by a WxC retail cus-

tomer in Chicago, seeking to contact someone in Salzburg, Austria. The call, when dialed, was routed to the nearest switch on the network, and that switch then determined further routing of the call. The Debtors' network was equipped with a computer-based signaling system, including routing tables, that allowed the various switching units to "speak" to each other. In the example, the Chicago switch determined, through the routing tables, that the lowest cost route to Salzburg was through the switch in Vienna.[7] There were then multiple routes to get the call to Vienna, and the Chicago switch chose to route the call through New York and London. As a result, several entities in the World Access group handled portions of the hypothetical call, e.g., a Facilicom switch in New York, a WATG transmission facility from New York to London, a WxC switch in London, and a Facilicom leased line from London to Vienna.

Billing information would automatically be recorded as part of this process. According to Burmeister, "[i]n each switch ..., there would be a record on the trunk route coming into the switch and on the trunk route going out of the switch so that we could determine where it came from, where it went to and what the length was." (Transcript, at 506) Burmeister stated that he was responsible for making sure that the switches and the network reported accurate call data to the billing system.

When Facilicom was acquired, efforts were made to eliminate duplication in the networks, in the backroom systems, and in personnel. For example, in New York City, the World Access group had one international gateway switch and Facilicom had two. A determination was made, after reviewing the traffic loads on these switches, that all three were not needed.

Accordingly, the existing switch, which was older, was retired in favor of the two Facilicom switches. All traffic was then moved to the Facilicom switches, resulting in savings on floor space, personnel, and network costs. Similar decisions were made concerning excess leased fiber capacity.

With respect to the backroom systems, it was determined that Facilicom's was superior. Accordingly, the existing billing system and support systems were eliminated. After several months, everything had been transferred to the Facilicom systems, and those systems were used to run the group's network and do the billing. The transfer required the data coming out of the switches for billing purposes to be routed to a different location (where the actual hardware was located that would rate the calls).

Burmeister also described his efforts to integrate the NETnet operations into the group. Again, determinations were made as to which assets to retain. Ultimately, the NETnet traffic was moved onto the World Access group's existing switches. In addition, sales forces were combined, resulting in space and personnel reductions.

The integration of the WxC operations in late 2000 and early 2001 involved a somewhat different situation. Although, as discussed above, WxC had an international wholesale long distance business, it also had a U.S. retail operation with fairly sophisticated retail service order and billing systems. Unlike the existing system used by the World Access group, the WxC system could be used to manage retail sales agents. Indeed, one of the reasons for acquiring WxC was to obtain the backroom systems that would enable the group

7. The Debtors engaged in least cost routing. As Burmeister explained, the goal was always to get traffic from one side of the network to the other at the lowest possible cost.

to support a larger retail operation. Accordingly, the decision was made to close down what had been the Facilicom billing system and convert to the WxC billing system. The WxC hardware and software was in San Diego, and all processing functions (previously performed in Pennsylvania backroom systems) were moved to San Diego. In connection therewith, the Facilicom office in Washington, D.C. was also closed and those functions transferred to San Diego, resulting in the termination of over seventy employees. Ultimately, the San Diego operation took over billing, network management, and customer trouble reporting for all the World Access entities. These changes were made gradually over a period of about six months in the latter part of 2000 and early 2001, not long before the filing of the Chapter 11 petitions in this Court.

The billing and related systems were powerful information systems that were able to report data quickly,—almost in real time,—in a variety of formats. Reports were regularly prepared from the call data recorded by those systems, summarizing the revenue and minute information on a country-by-country basis. The reports were prepared almost daily and distributed to upper management. Projections of profitability were likewise prepared, at least after the Facilicom acquisition, on a country-by-country basis.

While the group continued to maintain separate accounting records for the various legal entities, the operational and network integrations that took place over time made that task progressively more difficult. Henry Lyon testified that when he was hired in June of 2000, New World Access and WATP used an accounting software program called "Pointman;" Facilicom and Resurgens used the J.D. Edwards software package; CommNet, a division of WATG, used Quick Books;

PrimeTec, another division of WATG, used Great Plains; and WxC used the Sun accounting system. Consolidation of all the information from these different systems was a timeconsuming and cumbersome process. As a result of these and other difficulties, an internal restructuring plan was formulated that targeted, *inter alia,* reduction of the number of legal entities in the group and consolidation of the entities onto a single software platform.

As of December 31, 2000, the targeted reduction in legal entities, from over 130 to fewer than 30, was only about 20% complete. The accounting systems had been integrated from ten software platforms down to three, and the number of accounting centers from 48 to 16, essentially consolidating the independent contracting centers of the various acquired companies into one center per country.

By the time of the bankruptcy filing on April 24, 2001, the conversion and integration of all entities onto one accounting platform was substantially complete. The accounting systems of the various entities were consolidated onto the Sun system, used by WxC.

**The accounting records.**

Henry Lyon acknowledged that the integration of the accounting systems onto one software platform did not mean that the entities stopped keeping their own records:

Q. Just—just to be clear, just because the subsidiaries were converted to Sun, for example, it doesn't mean that they stopped keeping their own accounting books and records, isn't that right?

A. That is correct.

Q. They kept keeping their own general ledger.

A. Yes.

Q. Their own journal entries.

A. Yes.

Q. Their own trial balances.

A. Yes.

Q. I'm trying to use the accounting terms. In fact, integrating them onto one computer accounting system doesn't mean that you're commingling the assets of these companies, does it, sir?

A. No, it does not.

(Transcript, at 723).[8]

Separate books and records, including separate general ledgers, were maintained for Facilicom, for WxC, and for the operating divisions of WATG. New World Access and WATP shared a general ledger, designated as "corporate;" there were, however, separate WATP accounts within the corporate general ledger.

In addition, balance sheets were prepared on a subsidiary-by-subsidiary level to facilitate the consolidation of financial information for the group's financial statements. Henry Lyon testified that while "full-blown" financial statements were not kept for the subsidiaries, such statements could be generated from the accounting information that was available. He further acknowledged that his accounting group attempted to maintain the subsidiaries' financial information in accordance with Generally Accepted Accounting Principles ("GAAP"). Although, as discussed further below, he believed there were a number of issues that would have caused the subsidiaries' financial statements to fall short of that standard, he acknowledged that he and his staff were doing their "level best" every day to maintain standard accounting practices at World Access and its subsidiaries. He also stated that he was not aware of any significant transaction in the accounting records of either World Access or any of its subsidiaries during his tenure that was either described incorrectly or in a manner that would obscure its purpose.

Mark Gergel, the New World Access CFO until May of 2000 (and the CFO of Old World Access prior to the holding company reorganization), acknowledged as well that he and Martin Kidder (controller until June of 2000) "did a good job keeping the books and records of World Access, Inc. and its subsidiaries straight." (Transcript, at 375) He further acknowledged that both before and after the reorganization, during his tenure as CFO, World Access maintained sufficient internal accounting controls to accurately account for its assets and the assets of its subsidiaries as well as for intercompany transactions.

There were different types of intercompany transactions, and the volume changed over time. Earlier, when the group was still focused on equipment, there were daily cash transactions as money flowed through the Master Account System, and the monthly totals were booked at the end

---

8. In fact, Tod Chmar provided an affidavit in February, 2001, in connection with litigation in the district court for the Northern District of Georgia, stating that certain operations and management functions of WxC and World Access, Inc. had been consolidated (even prior to consummation of the merger of WxC). He further stated: "[A]ccounting functions between the two companies were integrated, but separate books of account were kept for the two companies. Continuing through today, there has been no 'commingling' of the assets of the two companies, and the original assets of WorldxChange can be identified and accounted for." (R [2] Exhibit No. 509) Chmar unconvincingly attempted to characterize this statement as referring only to those assets that constituted collateral for a loan made by one of the parties to the litigation. He stated, "The security agreement had a specific listing of assets that were security for that loan. And what I meant when I said this in the affidavit was that those assets could be specifically identified for purposes of perfecting or whatever or executing upon a security agreement." (Transcript, at 272)

of each month as intercompany transactions. There were also direct payments made to or on behalf of one entity by another, as well as occasional sales by one subsidiary of services or products to another subsidiary. After the group became more focused on telecommunications services, there were not only the daily cash transactions and direct payments but also huge numbers of intercompany service transactions, as calls traversed different portions of the network belonging to different subsidiaries. An intercompany transaction occurred each time one subsidiary provided services to another by handling a portion of a call.

Henry Lyon testified that these intercompany transactions, during his tenure as controller, would be recorded in the general ledger system:

> ... [T]he types of [intercompany] transactions that would have been recorded on the ledger would be movement of cash between any of the entities, direct payments either received or paid by one entity on behalf of another entity, and then the invoices related to the intercompany traffic carried over each other's networks.

(Transcript, at 580) Mark Gergel testified that while he was CFO:

> Every time there was a transaction between subsidiaries or between a parent company and a subsidiary, each of the companies would make appropriate entries in their general ledger with one of the entries always intercompany account.

(Transcript, at 350) For example, New World Access paid employees of its subsidiaries with World Access checks; these transactions would then be recorded in the intercompany accounts, so that the appropriate subsidiaries would bear the payroll costs. Similarly, when one subsidiary terminated a long distance call on its network

on behalf of another subsidiary, appropriate payable and receivable entries would be made in the respective ledgers of the subsidiaries to record the intercompany service transaction.

Mark Gergel further testified that, at least during his tenure, all cash inflows to and outflows from the Master Account were recorded for intercompany purposes. Michael Mies also testified that the World Access companies accounted for the sources and uses of cash as it flowed through the Master Account System. Indeed, his staff issued reports on the sources and uses of cash in the Master Account, and the reports grew more detailed and regular over time, until they were generated daily during the period prior to bankruptcy. Mies stated that during that period, he was not aware of any situation where cash was received by one of the entities but booked by another.

A reconciliation of intercompany balances would be performed on a monthly basis, in part to ensure that the intercompany transactions between the different entities netted out to zero. The transactions would net out to zero, because, *inter alia*, for every receivable there should be a matching payable. Henry Lyon acknowledged that intercompany accounts were in balance in all material respects through December 31, 2000.

There was, nonetheless, evidence adduced concerning certain transitional issues that arose during the integration of the billing systems, including costing for the intercompany service transactions. One aspect of this issue involved the unit cost, i.e., the rate applied to the number of minutes or seconds of a telephone call. Henry Lyon testified that there were some inconsistencies in terms of what the subsidiaries were billing each other for intercompany costs. He explained:

Each acquisition basically would have come on board with their own separate set of procedures or practices. . . .

But you have, say, in Germany we had or Austria we had remnants of WorldxChange were the remaining people after consolidation of offices, and in France NETnet people were the ones remaining after consolidation.

Well, the NETnet people would try to do all their intercompany invoicing based on the way NETnet used to do it. The WorldxChange people would try to do their intercompany invoicing the way that WorldxChange used to do it, and so on for each company or country, and so it created confusion in terms of inconsistencies.

(Transcript, at 603). Another reason for the costing issues was that some of the costing tables had not been updated. Lyon testified that the rate tables used for generating customer invoices were better maintained than the cost tables used to generate internal invoices.

Beginning in approximately January, 2001, shortly before the Chapter 11 petitions were filed, "minute issues" may have begun to surface. Lyon explained that the "minute issues" involved situations where the amount billed for telecommunications services sold by one subsidiary differed from the cost booked by the purchasing subsidiary,—not because of the rate applied, but because of the number of units (i.e., minutes) billed. Lyon gave the following hypothetical example:

> . . . NETnet Germany would bill Facilicom U.S. $3.2 million per the system. Facilicom U.S. would record costs of $2.6 million from NETnet Germany.

> The system should have spit out the exact same dollar amount for both, both sides, and it didn't, and we were able to narrow it down to see that, well, it was being driven by minutes. The minutes

that were being attributed to one side were not the same as the other.

(Transcript, at 607). Lyon also testified, however, that he did not "know what all the drivers were for the costing issues, whether it's solely unit or whether there was actually segments missing from those calls and not being costed properly." (Transcript, at 585)

Although Bobby Vannoy, "one of the key IT people" with responsibility for the billing system, believed the costing data issues were resolved by mid-March, 2001, Henry Lyon was more skeptical. He stated at one point, "I don't know that we ever got totally to the bottom of those issues." (Transcript, at 585) He also stated, when asked whether the costing issues were resolved prior to bankruptcy:

> I don't—I don't think that they were. They certainly, if the system was fixed at some point late in the game, it was never retroactively fixed.

(Transcript, at 613).

Lyon acknowledged, however, that he and his staff were doing everything they could to raise these issues with the operations people, who had responsibility for the billing system, so that they could work together to fix the accounting side of the problem. Indeed, an April 6, 2001 e-mail memorandum written by Lyon indicates that he clearly anticipated a resolution of these issues. He stated (to Bryan Yokley, then CFO), with regard to "January and February Financial Statements:"

> We have intercompany billing issues for both of these months—particularly with regards to February. . . . It takes a great deal of effort to post the intercompany bills and do a consolidation, so we have been holding off until intercompany is fixed. Otherwise we have a lot of rework to do when intercompany finally gets resolved.

I have not been able to get any definitive idea as to when this issue will get resolved, so I cannot give you a timeframe—the issues are really outside of the finance group's hands.

. . .

Please remember, Ellen has over 40 different sets of books in Europe that would need to be consolidated twice if we do it once and then fix it after the intercompany bills are corrected. . . .

My opinion is that our current situation makes the country by country actuals the most critical financial statements and that we should wait a few more days. . . .

(Debtors' and the Committee's Exhibit No. 219–7). Not only did Lyon anticipate a resolution, he apparently also believed that it might be forthcoming in the short term. Although he had no definitive idea as to the time frame, he thought it worthwhile to "wait a few more days" to see if the intercompany billing issues were resolved.

Although these issues were not totally resolved by the time of the petition, Lyon acknowledged that all of the call detail recorded by the Debtors' systems still exists. Walter Burmeister, who was responsible for making sure that the network reported accurate call detail to the billing system, testified that the World Access group handled approximately 1.5 billion calls per year, generating in excess of five billion records. He also testified that the raw call detail for these calls still exists and should be preserved on disk.

According to Lyon, there were certain other issues that might affect stand-alone financial statements for the separate entities. One of these issues involved items recorded at the consolidated level that actually related to the subsidiaries, e.g., additional allowances for bad debts recorded at the corporate level to provide increased reserves over and above the amounts that

the subsidiaries had recorded. Another issue involved situations where one subsidiary had a large receivable from a third party, while another subsidiary in the group had a large payable owed to the same party. The subsidiary with the large receivable, if evaluated on a stand-alone basis, might apply a significant reserve against its collectability, whereas, in the context of consolidated financial statements, the group's exposure on the receivable would be minimized because of the affiliate's large payable.

A further issue with stand-alone financial statements involved cost allocations that had not been updated. Lyon explained:

Well, for instance, Facilicom may have had its location in Austria, and it was performing some services for a neighbor country, and it may have had some standard monthly charge that it was charging that other country.

Well, Facilicom's office may have been closed, and the overhead costs were now showing up on WorldxChange, the surviving Austrian company, but Facilicom may have continued to bill the other company.

Obviously, they're billing for a cost that they're not incurring anymore.

(Transcript, at 620–21). Lyon testified that this intercompany allocation issue had not been resolved by the time of the bankruptcy filing.

Lyon also testified that the group had no uniform guidelines for the recording of intercompany interest charges. He stated that there was uncertainty as to whose interest policy to follow and what rates to charge.

Finally, he testified that the Debtors did not allocate overhead charges amongst themselves. He stated that the failure to allocate overhead costs could make one

entity's operating results appear, if evaluated on a stand-alone basis, artificially inflated at the expense of the entity that bore the administrative costs.

Although Lyon testified that he thought it would be "very difficult" to recreate at this point accurate stand-alone financial statements for the subsidiaries, particularly relating to the intercompany issues discussed above, he acknowledged that the relevant accounting data still exists. (Transcript, at 672 and 751) Lyon testified that Debtors continue to maintain the accounting information that was recorded in 2001 after the conversion to the Sun system. In addition, although some of the information from the historical software programs was converted and some was not, all the accounting information still exists in some format.

### Expert testimony: Louis Dudney

With respect to the separateness and integrity of the Debtors' books and records and the identifiability of their individual assets and liabilities, R$^2$ presented the expert testimony of Louis Dudney, a CPA and principal in Alix Partners. Alix Partners is a financial and operational consulting firm that provides litigation support and bankruptcy restructuring services. Dudney prepared two expert reports, based, *inter alia*, on an investigation of the Debtors' books and records and their computerized accounting system. He was given actual electronic access to certain relevant databases or ledgers within that system and created his own database of the downloaded transactions.

Dudney offered four opinions, three of which were interrelated. First, he opined that the books and records of "corporate," WxC, Facilicom, and WATG were separate, "corporate" referring to New World Access and WATP, which shared a general ledger. Dudney explained that the accounting records are kept within the general ledgers, and then on an individual basis, "those amounts then roll up into trial balances or financial statements for the various subsidiaries where there is a stand-alone general ledger." (Transcript, at 2072–73) He testified that separate ledgers were maintained for WxC, Facilicom, and for the divisions within WATG. Dudney's second and third opinions, related to the first, were that the intercompany transactions among corporate, WxC, Facilicom, and WATG were separately accounted for and that their assets and liabilities were therefore separate.

As part of Dudney's investigation into the accounting records, he traced over 2,000 transactions with an aggregate value in excess of $2.5 billion. He did not follow a statistical sampling method in selecting the transactions to be traced. Instead, he employed a "judgmental sampling" approach, which he testified was an accepted methodology that is based on the accountant's judgment, formed as he reviews transactions, "as to what is an appropriate level in order for [him] to render [his] opinion." (Transcript, at 2093) As part of his transaction tracing, he looked at contemporaneous documents (e.g., bank statements, invoices, and checks) that corroborated the Debtors' treatment of the transactions within the books and records. Dudney testified about several transactions, using demonstrative exhibits which included illustrations of the relevant accounting entries from the Debtors' records. One series of transactions, for example, set forth in Demonstrative Exhibit No. 809, involved several vendors all invoicing Facilicom as a separate entity. Demonstrative Exhibit 810, on the other hand, involved a single vendor separately invoicing several of the

Debtors.[9] According to Dudney, these transactions and the others that he described, including their accounting treatment in the Debtors' books and records, were representative of many of the other transactions that he had reviewed. He acknowledged that in certain instances there were errors, some of which were corrected and some which were not.[10] However, generally, the transactions he reviewed were correctly recorded in the Debtors' books and records.[11]

With respect to the costing issues raised by Debtors and the Committee in connection with intercompany traffic, Dudney testified that there was nothing he saw that indicated the problems could not be resolved. He noted that the emails relied on by Debtors and the Committee, which referred to corrective measures, were consistent with his view. He further noted that he had referred to this problem in his supplemental report, and he anticipated that a forensic accounting analysis to reconcile the issues, if required, would be a reasonable undertaking, as with any third-party billing dispute.

Finally, Dudney's fourth opinion was that the operating entities on a net basis

did not provide cash to the holding companies as a result of their operations, i.e., "that they were net users of cash." (Transcript, at 2128) Dudney testified that he analyzed financial data for the twelve months preceding bankruptcy to estimate the net incomes and the cash flows for WATG, WxC, and Facilicom. He stated that both the net incomes and the cash flows for those entities were negative. Dudney acknowledged that with respect to his figures for WATG, he had not included data for Resurgens, as it was not available within the database that he used.

Dudney also examined intercompany account reconciliations, which summarized the amounts due and owing between the various Debtors. According to Dudney, the reconciliation as of March 31, 2001 demonstrated that the operating debtors on a net basis owed money to the holding companies. He testified that he also confirmed that conclusion within the general ledger.

### Expert testimony: Scott Peltz

Debtors and the Committee offered the expert testimony of Scott Peltz ("Peltz").

**9.** Dudney testified that he was interested in invoices such as these not only because they were source documents, but also because they demonstrated to him "just how third parties interacted with the ... debtors at one level, at least from an accounting perspective." (Transcript, at 2111)

**10.** Debtors and the Committee attempted to undermine Dudney's opinion by demonstrating that he may have been unaware of inaccuracies in the accounting treatment for certain of the transactions. On cross examination, they showed him documentation concerning one of the traced transactions, which was accounted for in Debtors' books and records as a payment by Facilicom for legal services provided to it by Katten, Muchin & Zavis (Debtors' counsel herein). Debtors and the Committee made much of the fact that in this one example, of the many transactions traced

by Dudney, the documentation indicated that WATG may actually have been the recipient of the subject legal services, and not Facilicom.

**11.** Dudney testified that the last audit was performed as of December 31, 1999 and Ernst & Young opined that the consolidated financial statements were prepared in accordance with GAAP. Although no separate opinions were rendered as to financial records at the subsidiary level, Dudney testified that that was not unusual, primarily because the company reported to the public on a consolidated basis. However, he stated that the Ernst & Young opinion that the consolidated statements were in accordance with GAAP was at least one fact that provided "some indication as to the underlying financial records at a certain level since they build up to obviously and make up the consolidation that's presented to the public." (Transcript, at 2090)

Peltz is a managing director of American Express Tax and Business Services, an accounting and consulting firm, and also serves as the director of its national corporate recovery services group. Although Peltz opined concerning the separateness of the Debtors assets and liabilities, the primary area of examination concerned his liquidation analyses. Debtors and the Committee sought through these analyses to demonstrate, *inter alia,* that the creditors of each of the Debtors would recover more from one consolidated estate than they would recover from the five estates liquidated separately.

Peltz' liquidation analyses were summarized in Exhibit 76 to his expert report, marked as Debtors' and the Committee's Demonstrative Exhibit No. 236 at trial. Although Peltz had included five separate liquidation "scenarios" in this exhibit, he testified primarily concerning Scenario I, which assumed substantive consolidation of all five estates, and Scenario II, which assumed five separate estates, with intercompany balances treated as general unsecured claims.[12] Exhibit 76 itself is not in evidence; however, the Court reproduces certain of the relevant portions below for ease of reference, as a summary depiction of what was, in essence, Peltz' testimony:

**Scenario I:** **Substantive Consolidation of Bankruptcy Estates** (footnote omitted)

| Available Proceeds: | Consolidated Totals |
|---|---|
| Cash balances as of 12/31/01 | 51,715,204 |
| Repayment of Post–Petition Interco. Cash Transactions | - |
| Recoveries From Preferential Avoidance Actions, Including Intercompany Transfers | - |
| Recoveries From Preferential Avoidance Actions, Excluding Intercompany Transfers | 22,299,959 |
| Estimated Collections From Remaining Accounts Receivable | 53,956,141 |
| Estimated Collections From Liquidation of Other Assets | 24,900,000 |
| **Total Estate Proceeds Available** | **152,871,304** |

| Initial Distribution of Proceeds: | |
|---|---|
| Estimated Future Administrative Expenses | |
| Consolidated Legal/Professional/Consulting Fees | 5,000,000 |
| Trustee Fees | 411,000 |
| Assumed Post Petition Intercompany Charges For Overhead | - |
| Legal/Professional/Consulting Fees For Separate Bankruptcy Estates | - |
| Total Administrative Expenses | 5,411,000 |
| **Total Estate Proceeds Available After Payment Of Administrative Fees** | **147,460,304** |
| Pre-petition Bankruptcy Claims: | |
| Priority Claims—Taxes | 4,034,566 |
| Priority Claims—Employees | 424,613 |
| Priority Claims—Employee Benefit Plans | 144,295 |

12. R[2] objected to any testimony concerning either Scenario III, which contemplated partial consolidation into two groups, i.e., the non-operating entities (New World Access and WATP) and the operating entities (WATG, Facilicom, and WxC), or Scenario IV, which contemplated partial consolidation into two different groups, i.e., New World Access and its direct operating subsidiary WxC, on the one hand, and WATP and its direct operating subsidiaries, Facilicom and WATG, on the other. The Court sustained the objection, because, *inter alia,* Debtors and the Committee had failed to request partial consolidation as a form of relief in their motion for substantive consolidation.

Scenario V was the same as Scenario II, except that the preference recoveries and the NACT and BATM stock sale proceeds were reallocated to New World Access.

| | |
|---|---|
| Secured Claims | 1,260,000 |
| | |
| **Total Distributions Before Pro-rata Distribution to Unsecured Creditors** | 5,863,474 |
| | |
| Net Cash Available For Distribution to Unsecured Creditors | 141,596,830 |
| General Unsecured Claims Excluding Intercompany & Guarantees | 947,789,716 |
| Less: Reduction In General Unsecured Claims Due to Offsetting A/R | (46,967,025) |
| General Unsecured Intercompany Claims | - |
| | |
| **Total General Unsecured Claims Excluding Interco. & Guarantees** | 900,822,691 |
| **Est. Recovery % for Unsecured Claimants Before Intercompany Receivables** | 15.719% |

**Distribution of Intercompany Receivables:**

Pre–Petition Intercompany Receivable from WAI
Pre–Petition Intercompany Receivable from WATP
Pre–Petition Intercompany Receivable from WATG
Pre–Petition Intercompany Receivable from WxC
Pre–Petition Intercompany Receivable from FCI

Amt. distributed on Pre–Petition–Interco. Receivable from WAI
Amt. distributed on Pre–Petition Interco. Receivable from WATP
Amt. distributed on Pre–Petition Interco. Receivable from WATG
Amt. distributed on Pre–Petition Interco. Receivable from WxC
Amt. distributed on Pre–Petition Interco. Receivable from FCI

**Total Distributions of Pre Petition Intercompany Receivables**

**Est. Recovery % for Unsecured Claimants Before Guarantees**

**Effect of Guarantees And Upstreamed Distributions:**

| | |
|---|---|
| Cash to Parent After 100% Distribution to General Unsecured Creditors: | - |
| Net Cash Available After Intercompany and Upstreamed Distributions | 141,596,830 |

Effect of Cross–Corporate Guarantee Commitments:
First Union National Bank Indenture Trustee
 Original Obligation
 Less: Amount Distributed By Debtor Before Guarantees
 Deficiency Balance Claimed Against Guarantor
Telecommunications Finance Group
 Original Obligation
 Less: Amount Distributed By Debtor Before Guarantees
 Deficiency Balance Claimed Against Guarantor
PN Telecom (German Subsid.)
 Original Obligation
 Less: Amount Distributed By Debtor Before Guarantees
 Deficiency Balance Claimed Against Guarantor

| | |
|---|---|
| **Total General Unsecured Claims Excluding Interco. & Including Guarantees** | 900,822,691 |
| **Est. Final Recovery Percentage For Unsecured Claimants:** | 15.719% |

**Scenario II: Separate Bankruptcy Estates; Intercompany Balances Treated as General Unsecured Claims** (footnotes omitted)

| Available Proceeds: | World Access, Inc. ("WAI") | WA Telcom Products Co., Inc. ("WATP") | World Access Telecommns. Group, Inc. ("WATG") | World xChange Communs., Inc. ("WxC") | FaciliCom Int'l L.L.C. ("FCI") |
|---|---|---|---|---|---|
| Cash balances as of 12/31/01 | 27,550,401 | 9,800,964 | 5,849,337 | 2,882,827 | 5,631,675 |
| Repayment of Post-Petition Interco. Cash Transactions | (4,224,925) | 14,574,877 | (7,416,036) | (1,673,346) | (1,466,799) |
| Recoveries From Preferential Avoidance Actions, Including Intercompany Transfers | - | 21,131,116 | 504,070 | 4,753,317 | 334,419 |
| Recoveries From Preferential Avoidance Actions, Excluding Intercompany Transfers | - | - | - | - | - |
| Estimated Collections From Remaining Accounts Receivable | 5,571,880 | - | 19,966,737 | 544,850 | 27,872,674 |
| Estimated Collections From Liquidation of Other Assets | 20,040,000 | 3,000,000 | 1,760,000 | - | 100,000 |
| Total Estate Proceeds Available | 48,937,356 | 48,506,957 | 20,664,108 | 6,507,648 | 32,471,969 |

**Initial Distribution of Proceeds:**

| | World Access, Inc. ("WAI") | WA Telcom Products Co., Inc. ("WATP") | World Access Telecommns. Group, Inc. ("WATG") | World xChange Communs., Inc. ("WxC") | FaciliCom Int'l L.L.C. ("FCI") |
|---|---|---|---|---|---|
| Estimated Future Administrative Expenses Consolidated Legal/ Professional/Consulting Fees | - | - | - | - | - |
| Trustee Fees | 96,000 | 96,000 | 60,000 | 45,000 | 90,000 |
| Allocated Post-Petition Intercompany Charges For Overhead | (23,737,593) | 659,736 | 6,505,540 | 10,906,534 | 5,665,783 |
| Legal/Professional/ Consulting Fees For Separate Bankruptcy Estates | 4,942,910 | 11,432,264 | 2,033,683 | 2,694,897 | 3,896,245 |
| Total Administrative Expenses | (18,698,683) | 12,188,000 | 8,599,223 | 13,646,431 | 9,652,028 |
| **Total Estate Proceeds Available After Payment Of Administrative Fees** | 67,636,039 | 36,318,957 | 12,064,885 | (7,138,784) | 22,819,941 |
| Pre-petition Bankruptcy Claims: | | | | | |
| Priority Claims - Taxes | - | - | - | 4,008,946 | 25,620 |
| Priority Claims - Employees | 95,312 | - | - | 329,301 | - |
| Priority Claims - Employee Benefit Plans | 144,295 | - | - | - | - |
| Secured Claims | - | 1,260,000 | - | - | - |
| **Total Claims Distributions Before Pro-rata Distribution to Unsecured Creditors** | 239,607 | 1,260,000 | - | 4,338,247 | 25,620 |
| Net Cash Available For Distribution to Unsecured Creditors | 67,396,431 | 35,058,957 | 12,064,885 | (11,477,030) | 22,794,321 |

| | | | | | |
|---|---:|---:|---:|---:|---:|
| General Unsecured Claims Excluding Intercompany & Guarantees | 377,729,121 | 121,315,834 | 103,806,976 | 239,665,443 | 105,272,342 |
| Less: Reduction In General Unsecured Claims Due to Offsetting A/R | - | - | (171,987) | - | (46,795,038) |
| General Unsecured Intercompany Claims | 772,662,919 | 1,250,657,658 | 538,051,764 | 668,690,249 | 1,065,417,374 |
| Total General Unsecured Claims Including Interco. & Excluding Guarantees | 1,150,392,040 | 1,371,973,492 | 641,686,753 | 908,355,692 | 1,123,894,677 |
| Est. Recovery % for Unsecured Claimants Before Intercompany Receivables | 5.859% | 2.555% | 1.880% | -1.263% | 2.028% |

**Distribution of Intercompany Receivables:**

| | | | | | |
|---|---:|---:|---:|---:|---:|
| Pre-Petition Intercompany Receivable from WAI | - | 183,211,604 | 301,413,813 | 75,300,228 | 212,737,274 |
| Pre-Petition Intercompany Receivable from WATP | 661,206,343 | - | 301,413,813 | 75,300,228 | 212,737,274 |
| Pre-Petition Intercompany Receivable from WATG | 225,674,050 | 225,674,050 | - | 1,532,525 | 85,171,139 |
| Pre-Petition Intercompany Receivable from WxC | 251,442,339 | 251,442,339 | 3,132,471 | - | 162,673,100 |
| Pre-Petition Intercompany Receivable from FCI | 446,878,596 | 446,878,596 | 37,229,800 | 134,432,382 | - |
| Amount distributed on Pre-Petition Intercompany Receivable from WAI | (45,266,937) | 10,733,565 | 17,658,515 | 4,411,511 | 12,463,345 |
| Amount distributed on Pre-Petition Intercompany Receivable from WATP | 16,896,248 | (31,958,892) | 7,702,229 | 1,924,197 | 5,436,218 |
| Amount distributed on Pre-Petition Intercompany Receivable from WATG | 4,243,085 | 4,243,085 | (10,116,358) | 28,814 | 1,601,373 |
| Amount distributed on Pre-Petition Intercompany Receivable from WxC | - | - | - | - | - |
| Amount distributed on Pre-Petition Intercompany Receivable from FCI | 9,063,348 | 9,063,389 | 755,078 | 2,726,496 | (21,608,311) |
| **Total Distributions of Pre-Petition Intercompany Receivables** | (15,064,255) | (7,918,853) | 15,999,464 | 9,091,018 | (2,107,374) |
| Est. Recovery % for Unsecured Claimants Before Guarantees | 4.549% | 1.978% | 4.374% | -0.263% | 1.841% |

**Effect of Guarantees And**
**Upstreamed Distributions:**

| | | | | | |
|---|---|---|---|---|---|
| Cash to Parent After 100% Distribution to General Unsecured Creditors: | - | - | - | - | - |
| Net Cash Available After Intercompany and Upstreamed Distributions | 52,332,176 | 27,140,104 | 28,064,350 | (2,386,012) | 20,686,947 |
| Effect of Cross-Corporate Guarantee Commitments: | | | | | |
| First Union National Bank Indenture Trustee | | | | | |
| Original Obligation | | 117,918,125 | | | |
| Less: Amount Distributed By Debtor Before Guarantees | | (2,332,633) | | | |
| Deficiency Balance Claimed Against Guarantor | 115,585,492 | 115,585,492 | | | |
| Telecommunications Finance Group | | | | | |
| Original Obligation | | | | 25,441,693 | |
| Less: Amount Distributed By Debtor Before Guarantees | | | | - | |
| Deficiency Balance Claimed Against Guarantor | 25,441,693 | | | 25,441,693 | |
| PN Telecom (German Subsid.) | | | | | |
| Original Obligation | | | | | 2,500,000 |
| Less: Amount Distributed By Debtor Before Guarantees | | | | | (46,016) |
| Deficiency Balance Claimed Against Guarantor | 2,453,984 | | | | 2,453,984 |
| **Total General Unsecured Claims Including Interco. & Including Guarantees** | 1,293,873,209 | | | | |
| **Est. Final Recovery % For Unsecured Claimants:** | 4.045% | 1.978% | 4.374% | -0.263% | 1 841% |

As shown above, Peltz concluded that the percentage recovery for all creditors in a substantive consolidation (Scenario I) would be 15.719%, while their recoveries in stand-alone liquidations (Scenario II) would in each instance be less, ranging from a negative .263% recovery for creditors of WxC to a 4.374% recovery for creditors of WATG. In performing his analysis, Peltz began by identifying the assets that would be available for distribution. He first identified the cash balances for each Debtor, as shown in their monthly operating reports filed in these cases. As his liquidation analysis was prepared "as of December 31, 2001," he used the cash figures set forth in the December 31 operating statements, including $27,550,401 for New World Access and $9,800,964 for WATP.[13] Peltz testified that the $9,800,964

13. The December 31, 2001 cash balances totaled $51,715,204, which is the amount shown in Scenario I (substantive consolidation).

for WATP included no portion of the Master Account, which he had allocated to New World Access in Scenario II. Peltz nonetheless later claimed that Scenario II assumed WATP ownership of the Master Account. As explained further below, that claim was erroneous.

The cash balances in Scenario II were "as of December 31, 2001," and they therefore incorporated intercompany cash transactions occurring after the filing of the petitions herein (the "Petition Date"). Peltz assumed that these post-petition cash transactions would be repaid as administrative expenses prior to any distributions to general unsecured creditors.[14] Accordingly, the next line item in Scenario II is entitled "Repayment of Post Petition Intercompany Cash Transactions," and the amounts shown in that line item are taken from Exhibit 68 to Peltz' report, marked at trial as Debtors' and the Committee's Demonstrative Exhibit No. 228. In that exhibit, Peltz calculated the net post-petition intercompany cash transactions for each Debtor. He began with the cash balances as of the Petition Date (as shown in Debtors' amended operating reports for the period ending May 31, 2001), including a zero balance for WATP and $27,855,855 for New World Access. Again, Peltz testified that these numbers allocated the entire balance in the Master Account to New World Access. He then accounted for the postpetition cash transactions, arriving at the ending cash balances as of December 31, 2001. In the second line item in Scenario II, he recorded the total post-petition intercompany cash transactions for each Debtor, as calculated in Exhibit 68, including, *inter alia,* a net amount of $14,574,877 owed *to* WATP and a net amount of $4,224,925 owed *by* New World Access.

The $14,574,877 shown as due to WATP includes the sum of $14,160,170, which is reflected in the Debtors' operating reports as a deposit into the Master Account of proceeds from the post-petition sale of stock in NACT. Peltz assumed in Scenario II that WATP owned the NACT stock. Accordingly, since he had allocated the Master Account (in accordance with the amended operating reports) to New World Access, he showed the stock sale proceeds deposited in that account post-petition as an amount repaid by New World Access to WATP as an administrative priority claim.

WATP's December 31, 2001 cash balance of $9,800,964 consisted primarily of the sum of $9,681,755.44, shown in the Debtors' operating reports as a deposit of the proceeds from the post-petition sale of stock in BATM Advanced Communications Ltd.[15] Peltz assumed in Scenario II that WATP owned the BATM stock.[16]

Again, in spite of Peltz' testimony that he had allocated the Master Account to New World Access in Scenario II, he nonetheless stated that Scenario II assumed WATP ownership of the Master Account, explaining:

14. Indeed, all or most would likely be repaid as superpriority claims by virtue of orders entered on the Cash Management Motion. *See* n. 55, *infra.*

15. In Scenario V, Peltz reallocated the NACT and BATM stock sale proceeds from WATP to New World Access by transferring $23,841,925, i.e., the sum of the $14,160,170 in NACT proceeds and the $9,681,755.44 in BATM proceeds reflected in the operating reports.

16. The BATM stock sale proceeds were not deposited into the Master Account, but into an account that was treated in the operating reports as an account of WATP. Accordingly, it was not reflected in Peltz' analysis as an intercompany cash transaction, and there was no need for an entry repaying the deposit as an administrative claim.

[A]fter the balance of the cash account, we repaid master account and cash activity; and as you can see in the very next line, an additional $14 million goes into WATP. So the attempt of the schedule is to put WATP as owning the master cash account.

(Transcript, at 1321) Peltz, however, was referring in this testimony to the second line item in Scenario II, which, as discussed above, has the effect of repaying *post*-petition intercompany cash transactions (as administrative expenses). The entries in that line item do not have the effect of repaying *pre*-petition cash transactions or of transferring from New World Access to WATP any portion of the Petition Date cash balance in the Master Account, allocated in Scenario II to New World Access.[17] Accordingly, notwithstanding Peltz' statement quoted above, Scenario II assumes ownership of the Master Account by New World Access.[18]

In the next line item in Scenario II, entitled "Recoveries From Preferential Avoidance Actions, Including Interco Transfers," Peltz estimated aggregate preference recoveries of $26,722,922. His figures for preference recoveries were based on the preference payments identified by PricewaterhouseCoopers ("PwC") in their preference analysis prepared on behalf of the Committee. Peltz stated that his firm tested the PwC report and traced its entries back to the Debtors' operating statements or statements of financial affairs.[19] In calculating the anticipated preference recoveries, Peltz applied an overall recovery rate of 15% to the preference payments identified by PwC. He testified that, based on his experience with other bankruptcies in the telecommunications industry, the anticipated recovery rates for preference actions range from 10% to 20% and that he believed the 15% rate would be reasonable in this case.

Peltz used a similar approach to calculate the $22,299,959 preference estimate for Scenario I (substantive consolidation), relying again on the PwC analysis, but excluding preferential intercompany trans-

---

**17.** Peltz made a similar claim elsewhere in his testimony, when attempting to explain the difference between Scenario II and Scenario V. He stated:

... Scenario V is separate bankruptcy estates, which is the same as Scenario II except that the proceeds of NACT and BATM stock sale and preference recoveries are reallocated from WATP to WAI.

So Scenario II assumes that WATP owns the master bank account and Scenario V assumes that [World Access] owns the master bank account.

(Transcript, at 1258) However, Peltz' allocation of the NACT and BATM stock sale proceeds to WATP in Scenario II did not have the effect of attributing Master Account ownership to WATP. As explained above, Peltz allocated the entire balance of the Master Account to World Access in Scenario II and then repaid to WATP, as an administrative claim, the NACT stock sale proceeds that were deposited therein post-petition.

As to the anticipated preference recoveries, it is true that causes of action for recovery of preferential payments made from the Master Account would belong to the estate that owned that account. *See, e.g., In re Southmark*, 49 F.3d 1111 (5th Cir.1995). However, the allocation of the preference recoveries to WATP is inconsistent with the balance of Scenario II, which, as discussed above, assumes New World Access ownership of the Master Account.

**18.** Indeed, Debtors and the Committee concede as much in their proposed findings of fact, in which they state that the supplemental liquidation analysis prepared by R²'s expert, which incorporates and is based on Peltz' Scenario II, assumes that the Master Bank Account is not owned by WATP. (Proposed Finding of Fact No. 254)

**19.** Peltz admitted having testified incorrectly at his deposition that his firm had done no testing on the PwC report.

fers, which would be eliminated through consolidation.

The Court notes that in Scenario II, Peltz included $21,131,116 of the preference recoveries in WATP, calculated as 15% of $140,874,109 in payments made from the Master Account, as identified by PwC. However, as noted *supra*, n. 17, causes of action for the recovery of preferences belong to the estate that made the preferential payments. Scenario II assumes ownership of the Master Account by New World Access, and the payments giving rise to the $21,131,116 in estimated preference recoveries were made from the Master Account.

In the next asset category, Peltz estimated the collections from remaining accounts receivable. He testified that his figure of approximately $53,956,000 for the consolidated estates was based on discussions with the employees responsible for collections.[20] With respect to receivables in litigation, Peltz used a 45% estimated rate of recovery, based on discussions with Catherine Levesque, WATG's accounts receivable manager, who advised Peltz that recoveries on such receivables were anticipated to range from forty to fifty percent. Peltz stated that while his firm reviewed the status of each receivable, they did not do a litigation analysis. With respect to receivables owed by bankrupt telecommunications companies, Peltz employed a 10% recovery rate. He relied on his experience working with such companies, which according to Peltz typically yield a five to fifteen percent distribution.

As for other accounts receivable (i.e., those not in litigation, in bankruptcy proceedings, or used as offsets to the creditors' claims against the estate), Peltz esti-mated a recovery rate of 80%. He arrived at this estimate by assuming a 95% recovery and subtracting a collection charge of 15%, which he selected based on discussions with commercial collection agents (whose proposed fees ranged from fifteen to eighteen percent).

Peltz testified that in arriving at his figures for receivables collections, he offset against the accounts receivable any corresponding payables owed by the Debtors to the entities in question, thereby reducing the totals for anticipated receivables collections.

As for the final asset category, Peltz estimated $24.9 million in collections from the liquidation of "other assets." This figure included an estimated $20 million from "other causes of action," which were listed on a separate schedule. Peltz testified that the estimation of recoveries from such suits would be a difficult and speculative task. In arriving at the $20 million figure, he assumed that World Access would successfully claim the full $30 million limit of its directors' and officers' ("D & O") liability insurance policy and then deducted from that amount $11 million in known causes of action *against* World Access and its subsidiaries (rounding the $19 million difference to $20 million). Peltz admitted that he did not do any analysis with respect to the $30 million insurance recovery, but relied instead on information provided to him by counsel for the Committee, one of the proponents of substantive consolidation herein. As for the $11 million deduction, he admitted that he relied on Committee counsel for that figure as well. Peltz stated that in light of the "long list of potential litigation actions, including a claim ... [with] proceeds of anywhere

---

**20.** Peltz' accounts receivable analysis was depicted in greater detail in Exhibit 69 to his expert report, which was marked at trial as Demonstrative Exhibit No. 229. That exhibit also showed the derivation of the estimates for receivables collections for each of the Debtors for purposes of Scenarios II and V.

from 0 to 100 million," he regarded the $20 million estimate as "reasonable" and "conservative." (Transcript, at 1346) In Scenario II (separate estates), Peltz included the entire $20 million as an asset of New World Access.

The total of the foregoing asset categories in Scenario I (consolidation) is $152,871,304. Peltz next deducted the estimated expenses of administering the estates. In Scenario I, he used the figure $5 million as his estimate for "legal/professional/consulting fees," which he stated was derived from the Debtors' Disclosure Statement. In Scenario II, Peltz assumed that the "legal/professional/consulting fees" for the five separately administered estates would total $25 million, i.e., five times the cost of the single, consolidated administration. In arriving at the $25 million estimate, Peltz did not do a breakdown for each estate, reviewing the specific litigation or other matters that would generate the fees or the billing rates that would be employed. Indeed, counsel for the Committee acknowledged that it was "just a multiplication," and urged that any case-by-case analysis would "just not [be] possible." (Transcript, at 1256–57)

Notwithstanding Peltz' reasoning that the five separate estates would generate aggregate professional fees equal to five times the cost of a consolidated administration, he proceeded to allocate those fees in Scenario II on an unequal basis. First, he allocated $7 million of the $25 million total to WATP, on the theory that WATP would be the primary target of a great deal of litigation, including, *inter alia,* fraudulent transfer actions relating to the NACT and BATM stock and litigation concerning ownership of the Master Account. Peltz admitted, again, that the $7 million

was merely an estimate and that he did no calculation to arrive at that figure. He then allocated the remaining $18 million based on claims actually filed against each of the five estates, i.e., the ratio of the dollar volume of claims filed against a particular debtor to the aggregate dollar volume of claims filed against all five debtors. As to his chosen method of allocation, Peltz testified that it was his judgment, based on experience, that there is a relationship between the dollar volume of claims and the magnitude of administrative costs. He admitted that he performed no analysis to determine whether such a relationship might exist in this particular case. As a result of Peltz' chosen methodology for allocation of the estimated administrative fees, including the allocation of the initial $7 million discussed above, over $11 million of the $25 million estimate was allocated in Scenario II to WATP.

The remaining items under "Estimated Future Administrative Expenses" include quarterly fees due to the United States Trustee and allocated post-petition intercompany charges for overhead.[21] Peltz testified that he allocated post-petition overhead reported at the New World Access level to the other debtors, based on discussions with the Corporate Accounting Manager for New World Access, in accordance with their proportionate share of total operating receipts as shown in their monthly operating reports.

After deducting all estimated future administration expenses, Peltz next deducted prepetition secured and priority claims, including, *inter alia,* tax and employee benefit claims, to arrive at the net cash available for distribution to general unsecured creditors.[22] In Scenario I, the net cash is

---

**21.** The intercompany overhead charges do not appear in Scenario I because consolidation has the effect of eliminating intercompany claims.

**22.** The Court notes that in arriving at these

approximately $141,596,000. In order to calculate the percentage distribution to unsecured creditors, Peltz next tabulated the total general unsecured claims, excluding intercompany claims and guaranties. He used an aggregate claims figure of $947,789,716, based on the claims listed in the Debtors' schedules. In utilizing this figure, Peltz testified that he did not review or adjust the schedules for duplicate claims. He then deducted from this total the offsetting amounts owed by certain creditors, as discussed above, resulting in total general unsecured claims of approximately $900,822,000. Peltz accordingly estimated the recovery for general unsecured creditors in a substantive consolidation (Scenario I) as 15.719%, i.e., the net cash available for distribution divided by the total of general unsecured claims.

In Scenario II, Peltz employed a similar approach, except that he attempted to account for intercompany claims and guaranties. He began once again with figures for the general unsecured claims against each estate, excluding intercompany claims and guaranties, as derived from the Debtors' schedules, and he then deducted, by estate, the offsetting accounts receivable due from certain creditors. Unlike Scenario I, where intercompany claims are effectively eliminated due to the assumed consolidation, Peltz added in Scenario II the intercompany claims against each estate as shown in the Debtors' schedules. He divided the resulting figures, i.e., the total general unsecured claims against each estate including intercompany claims (but excluding guaranties), into the net cash available for distribution in each estate, to arrive at "initial" recovery percentages.

The initial recovery percentages purported to represent the respective payouts to creditors of each estate before consideration of the repayment of intercompany claims.

Peltz testified that "[i]n order to compute the distribution under separate estates, to the extent you have funds available, you need to pay intercompany receivables and payables." (Transcript, at 1274) He calculated the distributions on the intercompany receivables using the estimated initial recovery percentages discussed above. According to Peltz, ". . . the assets of the estates are [thereby] reallocated, essentially," resulting in revised recovery percentages. (Transcript, at 1274)

In calculating this "reallocation" of assets, Peltz admitted that he made no effort to eliminate duplicate intercompany claims, notwithstanding the fact that many of the intercompany claims asserted by and against New World Access and WATP, as shown in Scenario II, appear to be identical. He further testified that although he had offset payables and receivables with respect to third-party creditors, he did not do so with respect to the intercompany payables and receivables. Peltz offered no basis for the inconsistent treatment of these claims and admitted that offsetting the intercompany accounts would lead to different results. Indeed, inasmuch as the initial recovery percentages for each estate are different, the failure to offset intercompany payables and receivables results in a skewed reallocation, with larger net recoveries going to the estates with fewer assets.[23]

net cash figures in Scenario II, Peltz has augmented the assets of New World Access by the $23,737,593 in post-petition overhead charges assumed to be repaid by the other Debtors as administrative expenses, notwithstanding that $10,906,534 of it is owed by

WxC, which does not, according to Peltz' calculations, have sufficient assets to cover this entire liability.

23. On cross-examination, Peltz was also asked whether, after he submitted his expert

In any event, the distributions on pre-petition intercompany receivables, as calculated by Peltz, show New World Access with an approximate net dividend of *negative* $15 million and WATP with negative $8 million, i.e., they pay out on intercompany claims more than they receive. Peltz nonetheless acknowledged that, as a general proposition, the holding companies had funded the operations of the operating companies. He disagreed, however, that there was any inconsistency between that proposition and his calculation of large net dividends owed by the holding companies on intercompany claims.[24]

Finally, after accounting for intercompany claims and calculating the revised recovery percentages for each estate, Peltz took into account the effect of intercompany guarantees. He first calculated the amount that would be distributed on the guaranteed claim, using the revised recovery percentage for the estate of the primary obligor, and then included the "deficiency" (i.e., the original claim amount minus the estimated distribution thereon by the primary obligor) as a claim against the estate of the guarantor. After adding these net guarantee claims to the total general unsecured claims (including intercompany claims), Peltz re-calculated a final recovery percentage for each estate. The final percentages ranged from a negative .263% for WxC (i.e., zero) to 4.374% for WATG, all well below the 15.719% recovery that he estimated for all creditors of the consolidated estates in Scenario I. According to Peltz, the intercompany claims had "a tremendously dilutive effect on the distribution to creditors" and made the "biggest difference" between the estimated recoveries in consolidation and in separate administration. (Transcript, at 1276)

As indicated above, Peltz also testified, unrelated to his liquidation analysis, as to a number of other matters relevant to the issue of substantive consolidation. He opined, *inter alia,* based on the Debtors' business operations and accounting and financial records, that their assets and liabilities were "intertwined in such a manner as to render the unwinding of those assets as expensive, as well as yielding uncertain results." (Transcript, at 1098) In support of his opinion, Peltz testified that there was over $1 billion in prepetition overhead that had not yet been reconciled or allocated in the Debtors' books and records, including salaries, bad debts, and other charges. The largest single charge was in the amount of $711 million for good will amortization. Peltz admitted that while the reallocation of that charge had the potential to affect the liquidation analysis, he was not certain that it would. He further admitted that he was not in a position to opine that the $711 million needed to be allocated to any entity other than New World Access; he could only state that it was "a big number that bears investigation." (Transcript, at 1390). As to several other significant components of

---

report, the experts for R[2] identified an error in his methodology. Peltz admitted that there was a "formulaic error" regarding the intercompany distributions. Although he had included the *receipts* by each estate on their various intercompany receivables, he had failed to deduct the corresponding *payments* made by the estates on their intercompany payables. This error in the original version of his analysis had "resulted essentially in over-distributing under the separate estate scenar-ios" to the tune of over $90 million. (Transcript, at 1311–12)

**24.** Peltz stated: "No, I don't agree that it's inconsistent. There are huge amounts of intercompany transactions that occurred amongst and between these debtors, and to make one broad generalization about it I think is—oversimplifies the issue." (Transcript, at 1378)

the total unallocated overhead, Peltz stated that "other than identifying [them] as potentially allocable items," he'd "done no further work." (Transcript, at 1391) [25]

When Dudney was asked about the unallocated overhead identified by Peltz, he stated that he viewed it as a non-issue. He testified that there were only six accounts that made up approximately 92% of the total amount and that the fewer accounts there are to allocate, the simpler the task. He also stated that allocation of the good will charge, if necessary, would not take very long—perhaps no more than several hours. Finally, he stated that if any of the items identified by Peltz actually needed reallocation, they would probably only result in greater intercompany claims owing to the holding company Debtors.

Peltz also testified as to errors in the recording of intercompany transactions. He explained that he had reviewed an informal sampling of invoices and related contracts, correspondence, and bank records to determine whether the intercompany transactions documented thereby were properly recorded in the Debtors' intercompany accounts. He testified that he chose one of the 250 boxes of invoices that had been selected for review by R[2]'s experts from the Debtors' books and records. The box he chose contained 645 invoices, relating to both intercompany and third-party transactions. According to Peltz, approximately one-half of the 645 transactions involved intercompany activity, and he analyzed each one of them and had them traced through the general ledger. He testified that approximately half of the intercompany transactions in the group

that he had selected were not properly recorded.

Peltz estimated that there were approximately 444,000 intercompany transactions involving banking activity (as distinguished from transactions related to trafficking of calls across the various Debtors' switches). He testified concerning a summary of certain of the transactions that he had reviewed.[26] For example, one of the transactions that he described from that summary involved an invoice issued by Facilicom with respect to services performed under a contract entered into by WATG with Nortel Telecom, Inc. The check received on account of that invoice was made payable to World Access and was deposited into Facilicom's account. Peltz testified that the research and review of that transaction alone took over an hour. According to Peltz, all 444,000 of such transactions would have to be reviewed.

In spite of this testimony concerning the anticipated difficulties in reconciling intercompany accounts, Peltz did acknowledge, generally, that the Debtors tracked intercompany claims, including the minutes of usage on calls trafficked across the Debtors' switches. Indeed, when specifically asked about the degree of potential difficulty in separating the Debtors' assets and liabilities, he responded that they "cannot be separated easily" and "would require a significant amount of analysis and ... cost a significant amount of money to accomplish." (Transcript, at 1200)

### Expert testimony: Bruce DenUyl

R[2] offered the opinion of another expert, Bruce DenUyl, in support of its view (and contrary to the liquidation analyses

---

**25.** Peltz testified in a similar fashion as to $187 million in prepetition overhead items that *had* been allocated, i.e., that he did not know whether they had been improperly allocated or not.

**26.** The summary was attached as Exhibit 62 to Peltz' expert report and marked as Debtors' and the Committee's Demonstrative Exhibit No. 222.

performed by Peltz) that many creditors, including $R^2$, will recover more in debtor-by-debtor liquidations than in substantive consolidation. DenUyl is cohead of the financial advisory services group at Alix Partners. Although DenUyl, in his original and supplemental expert reports, developed opinions on a number of matters, $R^2$ determined at trial to examine him only with respect to his liquidation analysis and his critique of Peltz' liquidation analyses.

DenUyl, in performing his own liquidation analysis, stated that he relied on the asset values set forth by the Debtors in their Disclosure Statement. He testified that the asset values contained in the Disclosure Statement were very similar to the asset values in the liquidation analysis prepared by PwC for the Committee. He stated that in order to corroborate the information contained in the Disclosure Statement, he reviewed (some time after the issuance of his original expert report) the Debtors' monthly operating statements and their schedules, checking the information against the source documents they had used. He employed a similar approach as to the PwC analysis, testifying that he found their figures to be consistent with the operating reports and schedules, after eliminating certain duplicate claims.[27]

The first of DenUyl's analyses assumed a substantive consolidation of the estates and is depicted below:

| | |
|---|---:|
| Estimated Total Liquidation Value of Assets | $ 95,000,000 |
| Less: Estimated Administrative Costs | 15,100,000 |
| Less: Estimated Secured/Priority Claims | 4,575,000 |
| Estimated Assets Available for Distribution | $ 75,325,000 |
| Estimated Total General Unsecured Claims | $746,000,000 |
| Estimated Percentage of Recovery | 10.1% |

DenUyl explained, again, that all of the numbers set forth above were taken from the Disclosure Statement. According to DenUyl, the difference between the $95 million in total assets above as compared with Peltz' $153 million figure resulted primarily from three items, i.e., preference recoveries, accounts receivable, and "other assets."

DenUyl explained that while Peltz had included approximately $22 million in preference recoveries (calculated at 15% of the preferences identified by PwC), DenUyl chose not to include any, regarding them as too speculative. He testified that any preference analysis would be a very detailed endeavor and admitted that he had not performed any such analysis in this case. As for accounts receivable, DenUyl used the $30 million figure contained in the Disclosure Statement and questioned Peltz' estimate of over $53 million, particularly in light of the fact that the receivables were in the financially troubled telecommunications industry and were also older and presumably less collectible than when estimated for disclosure statement purposes. DenUyl acknowledged, however, that he had not done any work to validate the Debtors' estimate. Finally, as to the "other assets" included by Peltz, the primary item was the $20 million in litigation recoveries that he had estimated based on discussions with counsel for the Committee. DenUyl did not include any such recoveries, again believing them to be too speculative. DenUyl further testified that other than the foregoing three items, Peltz had relied on many of the same sources that were used by the Debtors and

27. DenUyl acknowledged that in forming his opinions, he had had no communications with anyone at PwC concerning the PwC liquidation analysis. He also acknowledged that there was a "slight update" to the PwC analysis after the issuance of the September 2001 version that he used; but the update showed more assets for WATP and was therefore less conservative. (Transcript, at 1703)

by PwC in estimating the total assets available for distribution.

According to DenUyl, the difference between Peltz' 15.719% estimated recovery in a substantive consolidation and DenUyl's 10.1% was also attributable to the lower administrative costs used in Peltz' analysis. DenUyl pointed out that Peltz had estimated such costs, for consolidation purposes, at approximately $5.4 million, rather than the $15.1 million set forth in the Disclosure Statement. According to De-

nUyl, this discrepancy, combined with the $65 million difference in asset values attributable largely to the three asset categories described above, substantially accounts for the difference in percentage recoveries estimated by the two experts for general unsecured creditors in a substantive consolidation.[28]

DenUyl, like Peltz, also prepared a liquidation analysis estimating creditor recoveries in a debtor-by-debtor liquidation. His analysis is depicted below:[29]

| | WATP | WAXS | Facilicom | WATG | WxC |
|---|---|---|---|---|---|
| Estimated Liquidation Value of Assets | $ 53,200,000 | $ 4,750,000 | $ 15,200,000 | $ 20,900,000 | $ 950,000 |
| Less: Est. Admin. Costs | 3,473,000 | 2,265,000 | 151,000 | 906,000 | 8,305,000 |
| Less: Est. Additional Admin. Costs for Stand-Alone Distributions | 1,200,000 | 1,200,000 | 1,200,000 | 1,200,000 | 1,200,000 |
| Less: Priority and Secured Claims | 960,750 | 183,000 | 45,750 | - | 3,385,500 |
| Est. Net Assets Available for Distribution | 47,566,250 | 1,102,000 | 13,803,250 | 18,794,000 | (11,940,500) |
| Est. General Unsecured Claims | 119,360,000 | 373,000,000 | 55,950,000 | 63,410,000 | 134,280,000 |
| Est. Percentage of Recovery | 39.9% | 0.3% | 24.7% | 29.6% | -8.9% |

DenUyl testified that he began with the same figures for total asset values and costs that he had used in his consolidation scenario, i.e., those set forth in the Debtors' Disclosure Statement, and then allocated those values and costs among the five Debtors based on percentages that he derived from the PwC liquidation analysis. In deriving the percentages for asset values,[30] DenUyl testified that he calculated

the ratio of the total assets for each debtor, as shown in the PwC report, to the total assets for all debtors. For example, he testified that WATP held 56% of the total assets identified by PwC. DenUyl accordingly applied that percentage to the $95 million in total assets to arrive at an estimated $53.2 million asset figure for WATP in his own debtor-by-debtor liquidation analysis. He testified that the $53.2

28. Peltz used a higher figure for general unsecured claims, i.e., $900,822,000 (based on the Debtors' schedules but without eliminating duplicates), which had the effect of reducing Peltz' estimate of consolidation recoveries.

29. With footnotes omitted.

30. DenUyl testified that he used a similar method to derive allocation percentages for costs and for claims, again based on the PwC analysis. He acknowledged that PwC assumed (at least in that portion of the PwC analysis from which he derived his percentages) that intercompany claims were subordinated to general unsecured claims.

million figure consisted largely of cash, acknowledging that the PwC analysis assumed WATP ownership of the Master Account and that he had made a similar assumption for purposes of his analysis. As shown above, DenUyl estimated the total assets held by New World Access as only $4.75 million, again based on the percentages derived from the PwC analysis.

In allocating administrative costs among the five Debtors, DenUyl first added $6 million to the $15.1 million in costs estimated in the Disclosure Statement for a consolidated administration. DenUyl obtained the $6 million figure for additional administrative costs in a debtor-by-debtor liquidation from the Disclosure Statement, which, according to DenUyl, had provided for approximately $200,000 per month in additional costs for each estate for a period of six months. He acknowledged that he did not do any independent analysis as to whether certain estates would incur greater expenses than others, explaining that any attempt to analyze the litigation and other costs for each estate would require a significant undertaking.

DenUyl then deducted the allocated priority and secured claims, to arrive at the net assets available for distribution to unsecured creditors, including approximately $47.6 million for WATP and $1.1 million for New World Access. After allocating the general unsecured claims among the five Debtors, he calculated the estimated recovery percentages for creditors. As shown above, the percentages vary widely, including a 39.9% recovery for WATP creditors and a recovery of only .3% for creditors of New World Access. According to DenUyl, therefore, the recoveries to creditors of WATP (and certain other Debtors) in stand-alone liquidations are much greater than their projected recoveries in consolidation.

DenUyl also calculated, based on these percentages, $R^2$'s aggregate recovery in a consolidation and in a debtor-by-debtor liquidation. According to DenUyl, $R^2$ would recover approximately $9.785 million in consolidation (i.e., 10.1% of its total claims of $96,884,940) as compared with approximately $17.2 million in stand-alone liquidations (i.e., 39.9% of its $42,758,138 in WATP Convertible Notes plus .3% of its $54,126,802 in New World Access Senior Notes).

DenUyl testified, finally, as to the primary differences between his debtor-by-debtor liquidation analysis and that performed by Peltz. Peltz not only used higher asset and claims figures, which he allocated differently among the Debtors, but he also included the analysis of intercompany claims. DenUyl disagreed with Peltz' treatment of the intercompany claims, explaining that there were a number of flaws in his methodology. First, Peltz failed to eliminate the obvious duplication that resulted from identical claims being scheduled by the operating subsidiaries against each of the holding companies. For example, Peltz included a claim by WATG against New World Access in the amount of $301,413,813 and an identical claim by WATG against WATP. DenUyl testified that the inclusion of these duplicates increased the total claims, thereby reducing the estimated recovery percentages in Peltz' debtor-by-debtor liquidation.

Second, as discussed above, Peltz offset receivables against payables as to third-party creditors, but not as to intercompany claims. As a result of his failure to offset the intercompany payables and receivables, Peltz showed the holding companies as distributing greater sums to the operating subsidiaries than they received in return. For example, DenUyl observed that in Scenario II, Peltz showed a net amount

owing *by* New World Access on intercompany claims in the amount of $15,064,255 and by WATP in the amount of $7,918,853. According to DenUyl, the result should have been just the opposite, in light of the fact that the holding companies had been funding the losses of the operating subsidiaries.[31] Since the subsidiaries were "net cash takers," Peltz' conclusion that net amounts were owed *to* the subsidiaries was illogical and stemmed in large part from his failure to offset. DenUyl explained that "if you don't offset, those debtors that have more assets are funding the ones that have less ...." (Transcript, at 1691) For example, for every claim that WATG had against New World Access in Peltz' analysis, it would recover approximately 5.8%, whereas New World Access would only recover about 1.8% on its claims against WATG.

DenUyl testified that a proper intercompany analysis (e.g., one that offset payables against receivables) would result in net distributions owing *to* the holding companies, thereby increasing their assets and consequently their percentage dividends to creditors. Accordingly, since the recoveries by holding company creditors (such as R$^2$) in a debtor-by-debtor liquidation would only *increase* if intercompany claims were properly offset, the analysis of intercompany claims could simply be eliminated for purposes of determining whether such creditors recover more in stand-alone liquidations. In other words, if it can be shown that holding company creditors benefit from stand-alone liquidations *without* consideration of intercompany distributions, then there is no need to include the intercompany analysis, as it would only magnify that benefit.

DenUyl attempted to show, through a demonstrative exhibit, that even Peltz' analysis shows greater recoveries for the holding company creditors in stand-alone distributions when intercompany claims are eliminated. DenUyl testified that he simply used Peltz' figures from Scenarios I and II, but "stopped after the general unsecured claims" (i.e., after the third-party general unsecured claims minus offsetting third-party receivables) (Transcript, at 1692). DenUyl then calculated the percentage dividends for each Debtor by dividing its net available assets by the general unsecured claims. The results were 17.8% recoveries for New World Access, 28.9% for WATP, 11.6% for WATG, –0–% (negative 4.8%) for WxC, and 39.0% for Facilicom in stand-alone liquidations, as compared with 15.7% in consolidation.

DenUyl testified, in summary, that had Peltz applied offsetting consistently, "it would have dramatically changed his numbers ...; ... consolidation would result in an inequitable distribution of assets to some of the creditors," i.e., the creditors of New World Access, WATP, and Facilicom. (Transcript, at 1694)

**Dealings with the public and creditor perception.**

Finally, with respect to issues relating to creditor perception of the entities in the group, the parties designated and counter-designated portions of the deposition of Steven J. Rubio, assistant controller and director of corporate finance for World-Com, Inc. Rubio acknowledged that WorldCom maintained separate contracts with the operating Debtors and other operating subsidiaries in the World Access

---

**31.** DenUyl testified that he relied on the expert opinion of his colleague Louis Dudney, discussed *supra*, for the conclusion that the operating subsidiaries were "net cash takers," as well as on his own analysis that showed there were operating company losses funded by the parent. He did not, however, himself perform an offset analysis as to the intercompany claims shown.

group. Although efforts were made shortly before the Debtors' Chapter 11 petitions to consolidate all the agreements into one set of agreements (between WorldCom Network Services, Inc. and WxC), the Debtors never operated under the consolidated agreements.

WorldCom also maintained separate invoicing accounts for the operating Debtors and billed them separately. The operating Debtors, in turn, separately billed and accounted for their transactions with WorldCom.

Shortly before these cases were commenced, at about the time that efforts were being made to consolidate all the WorldCom agreements into one set of agreements with WxC, WorldCom sought a guaranty by New World Access of the obligations incurred and to be incurred by WxC. Rubio testified that he recalled that without the signed guaranty, the companies would continue to operate under their respective separate agreements.[32] The

guaranty was not signed by New World Access.

Notwithstanding Rubio's testimony concerning the separate contracts and invoicing accounts maintained by WorldCom and the numerous contemporaneous records (admitted as exhibits herein) corroborating same, he nonetheless testified generally that all the billing and related activity for the operating subsidiaries was managed by one senior management team at World Access, Inc.[33] Debtors and the Committee rely greatly on these general statements, as well as on certain testimony by Tod Chmar and Michael Mies. With respect to Chmar, however, the testimony cited by Debtors and the Committee (in Proposed Finding of Fact No. 198) actually indicates that Chmar did not generally deal with vendors and customers of the operating subsidiaries, but did so only occasionally in the acquisition context:

Q. Did you ever have occasion to deal with any vendors or customers on a

**32.** Debtors' and the Committee's objection to this testimony based on lack of personal knowledge is overruled. Rubio recalled seeing the draft guarantee, a copy of which was received in evidence as R[2] Exhibit No. 545, some time during the first quarter of 2001, and he also recalled that it was prepared by WorldCom's counsel. He testified at one point, "Well, now that I'm looking at this document, my recollection is this is a document that was prepared in conjunction with the effort on behalf of the sales organizations to consolidate all the World Access historical contracts under one contract under the name of WorldxChange Communications." (Rubio deposition, at 179). Although this last statement is also objected to based on lack of personal knowledge, no foundation objection was made at the deposition. An objection to form was made, and Debtors and the Committee assert that the question, which referenced discussions Rubio had had concerning the guarantee, assumed facts not in evidence. Rubio testified, however, that he recalled discussions about the guarantee.

Moreover, Rubio is Assistant Controller and Director of Corporate Finance at WorldCom, Inc. and prior thereto was Director of the Communications Services Group. In approximately the third quarter of 2000, he assumed additional responsibilities with respect to the receivables owed to WorldCom by World Access. He was deposed as a Rule 30(b)(6) witness and was prepared to testify about matters known or reasonably available to WorldCom. When shown an e-mail memo from someone else in the WorldCom organization to an employee directly reporting to Rubio, Rubio's recollection was refreshed that WorldCom would not operate under the new consolidated agreements with WxC without the guaranty. The hearsay objection with respect to the e-mail memorandum is also overruled, as it was merely being used to refresh recollection. Under the circumstances, Rubio's knowledge, both personal and otherwise, is more than sufficient to support admission of the testimony.

**33.** *See, e.g.,* Rubio deposition, at 139.

global basis as opposed to a subsidiary basis?

A. Yes. *Generally such discussions weren't occurring at my level or Jack Phillips' level.* But in connection with the series of acquisitions we were doing, we ended up talking to most of our competitors and peers *in the acquisition context.*

And *in that context,* when a problem would arise with a vendor or a customer—and most of them were both vendors and customers-in terms of accounts and selling accounts, the accounting people would come to us and say, "Can you get them resolved? Let's get this collected." And I would occasionally have discussions with CEOs of those companies.

(Transcript, at 215–16) (emphasis added). Michael Mies' testimony was to a similar effect, i.e., that he dealt with major creditors or vendors on behalf of the subsidiaries "periodically," e.g., to secure credit or renegotiate credit terms. (Transcript, at 777–78)

The parties further designated and counter-designated portions of the deposition of Norma Jean Starling Brown, collections manager for AT & T. It is clear from her testimony that AT & T separately invoiced WxC and other members of the World Access group for the usage of telecommunications services that AT & T provided to them. Although AT & T ultimately began mailing all of its invoices to WxC for processing, the usage by WxC and other entities continued to be separately tracked by AT & T.

Prior to the WxC acquisition, in March of 2000, World Access issued a letter to all of its vendors, announcing a buying consortium among World Access, WxC, Star Telecommunications, and their affiliates.

The buying consortium was intended to afford the companies an opportunity to negotiate more favorable rates through their combined purchasing power. At the time the letter was issued, World Access had entered into but not yet consummated merger agreements with WxC and Star. R[2] noted that the letter contained the following language:

Effective immediately, all future rate negotiations with respect to domestic and international switched termination service ("Service") purchased from your firm by World Access, Star, WorldxChange or any of their worldwide affiliates listed below (collectively the "Companies") will be handled exclusively by the Consortium Purchasing Group in San Diego, California. . . .

In order to facilitate this arrangement, we request that all future rate increases or decreases be made applicable to all of the Companies. . . .

Although all future rate negotiations will be coordinated for the Companies, there will be no other change in your relationship with any of the Companies. *Accordingly, each of the Companies will continue to be solely responsible for any Service purchased from your firm, and except as may be otherwise agreed in writing signed by all parties, none of the Companies will be responsible for any obligations or liabilities of any of the other Companies.* Additionally, except with respect to the notification requirements for rate matters set forth above, all other terms and conditions of your contacts [sic] and agreements with each of the Companies will continue to apply and remain unchanged.

(Debtors' and the Committee's Exhibit No. 399) (emphasis added).[34] Attached to the

34. Debtors' and the Committee's Exhibit No. 399 is a copy of the letter that was sent to

letter was a list of affiliates included within the defined term "Companies." Despite this carefully crafted language, Tod Chmar testified that it was included merely to make it clear that "none of the *three* companies [i.e., World Access, WxC, and Star] was guaranteeing or otherwise responsible for the obligations of those other *two* companies" (since the mergers had not yet been consummated). (Transcript, at 219) (emphasis added) Chmar, however, retreated somewhat on cross-examination:

Q. And the definition—I just want to be clear on your earlier testimony, the definition of companies includes World Access, Star, WorldxChange or any of their worldwide affiliates listed below; is that right?

A. That is—I mean, it's unclear to me reading this letter right now what that means. I testified prior to this time that with respect to the paragraph on the second page, "companies" was meant to be each of three distinct entities, World Access and its affiliates on one hand, Star and its affiliates on the other hand and WorldxChange on the third hand.

(Transcript, at 259)

On the issue of creditor perception, the parties also adduced evidence concerning the use of brand names, trademarks, and other means of identification in the marketplace. Debtors' and the Committee's Exhibit No. 213b–2 includes a WxC check that bears the WxC name and logo but also indicates that it is a "World Access Company." The same exhibit includes a document with the NETnet logo, also indicating "A World Access Company," and a PrimeTec invoice bearing both the PrimeTec name and logo and the World Access name and logo. R[2] introduced many exhibits, including invoices, sent to creditors by the operating Debtors solely under their own names and logos.

At the time Facilicom became associated with the World Access group of companies, the name "Facilicom" had brand identity in the wholesale telecommunications marketplace. Even after Facilicom became associated with World Access, the name "Facilicom" was a brand name that continued to be used for the wholesale telecommunications business in Europe. The wholesale entities that operated in the United States operated under the World Access brand.

In addition, certain subsidiaries of Facilicom with retail operations in two Scandinavian countries operated under the retail long distance brand names "Tele 8" and "Tele 1." They continued to operate under those names for some period of time after Facilicom became associated with World Access. However, when LDI NETnet was acquired, the company moved toward a single retail brand name in Europe, i.e., NETnet.

The Debtors operated in non-coextensive geographic markets. For example, WxC had sales in New Zealand and Australia, while Facilicom did not, and CommNet had operations in Mexico, while Facilicom and WxC did not.

At the time that Facilicom became associated with World Access, Facilicom operated in thirteen countries in Europe, and in some of those countries, the World Access group had no operations. In other markets, Facilicom and other World Access companies actually had competed for the same customers.

WorldCom. *Similar letters were received in evidence as Debtors' and the Committee's Exhibit No. 19 (the template letter) and R[2]*

Exhibit No. 259 (the letter that was sent to "Wiltel/WorldCom").

WxC also had its own brand identity in the marketplace and operated under the "WorldxChange" name. Lyon testified that at about the time that he joined World Access in June of 2000, WxC and Facilicom were still competing in certain markets.

Additional evidence of how the Debtors were presented to the public was also adduced in the form of SEC filings and testimony regarding the financial and other information contained therein, as well as testimony concerning conference calls with security analysts, press releases, bond ratings, and similar matters. New World Access, as a publicly traded entity, was required to file annual 10K and quarterly 10Q reports with the SEC. Copies of various 10K, 10Q, and 8K reports were offered, *inter alia,* by Debtors and the Committee and received into evidence, including copies of the 10K reports for the years ended December 31, 1997, 1998, and 1999, and the quarterly 10Q reports for 1998, 1999, and 2000.

The financial statements were presented on a consolidated basis and were audited by Ernst & Young beginning in 1999 and by PwC prior thereto. The 2000 10K was never filed. At the time of the Chapter 11 petitions, the company had internally completed a substantial portion of the financial statements, the footnotes, and the 10K document itself. In addition, Ernst & Young's audit was substantially complete from a time perspective, but not from a process perspective. The "wrap-up" phase remained, which involved conferences between the company and the auditors to review and discuss findings and resolve potential disagreements.

The World Access group of companies filed consolidated tax returns. In addition, press releases presented financial information on a consolidated basis. The two primary types of press releases transmit-ted by the company related to acquisitions and quarterly earnings announcements. From December, 1998 to April, 2001, the quarterly earnings announcements were presented on a consolidated basis; however, the equipment group was broken out as a separate group prior to the announcement that those businesses would be sold.

There were also quarterly conference calls with security analysts, in each instance after the press release was made. A script was prepared for the presentation, which was followed by a question and answer period. Again, other than equipment group results, the financial information was disclosed, as in the press releases, on a consolidated basis.

Although consolidated financial information was presented in the press releases and the SEC filings, the annual 10K and quarterly 10Q reports also included summary financial information for WATP, i.e., abbreviated balance sheet and operating statement information. As part of the holding company reorganization in October of 1998, the SEC required that this information be included for the benefit of the holders of the Convertible Notes. Accordingly, it was included on a quarterly basis from and after the time of the reorganization.

The summary financial information for WATP actually consisted of financial data for WATP and its subsidiaries. WATP itself, as indicated above, was a holding company and had no operations of its own. According to Mark Gergel, CFO, separate books and records for the WATP subsidiaries were maintained, and the results of their operations were rolled up into WATP. Henry Lyon, controller, testified that his financial reporting group actually prepared the summary WATP financials for inclusion in the SEC filings. He explained that in addition to the consolidation or roll-up of the financial data for all

the WATP subsidiaries, a further step was required; information from the separate WATP accounts maintained within the corporate general ledger had to be incorporated into the summary presentation. Indeed, this step was overlooked in connection with the preparation of the 10Q for the period ended September 30, 2000, resulting in an understatement of its long-term debt.

Martin Kidder, Lyon's predecessor, recalls that the WATP data was most efficiently prepared by backing out of the group's consolidated results the information for the handful of companies that did not roll up into WATP. He further testified that the summary information could be prepared in many different ways.

Again, the summary financial information was abbreviated; i.e., data was given only for major categories. For example, information for the category "current assets" was included in the balance sheet section, but no detail concerning its components. Accordingly, the amount of cash included within "current assets" was not specified. Lyon testified, with respect to the summary WATP financial information included in the 10Q report for the quarter ended September 30, 2000, that the current assets would be primarily accounts receivable of WATP subsidiaries and "some cash balances in prepay accounts, things such as that." (Transcript, at 667)

While the amount of cash for the consolidated WATP entities was not included in the summary WATP financial information, Gergel testified that the maximum amount of cash for all entities other than New World Access could be ascertained, at least as of the filing of the annual 10K report, from other information included therein. The 10K reports contained an exhibit setting forth condensed financial information for New World Access on a stand-alone basis, including a category for "cash and equivalents." Gergel explained that the cash for all subsidiaries of New World Access would simply be the difference between the consolidated cash (for all entities) and the cash shown in the condensed financial information for New World Access alone.

In addition to the information contained in SEC filings, ratings information was available from Standard & Poor's ("S & P"). The ratings, of course, ultimately fell, but prior to February 21, 2001, the New World Access corporate credit rating was "B," the rating on the Convertible Notes was "CCC+," and the rating on the Senior Notes was "B-." Gergel testified that it was understood, at the time the Convertible Notes were issued, that after the deal closed Debtors would seek to obtain a credit rating for the notes so that the noteholders would have the benefit of an orderly secondary market.

As described further below, R[2] portfolio manager Mark Horrell reviewed publicly available information in connection with R[2]'s purchases of the Senior Notes and Convertible Notes. R[2]'s first purchase of Convertible Notes was on June 10, 1998; it purchased $1 million in notes for the sum of $1,006,390, or 100.639% of the face amount. No further purchases were made until May 4, 1999. On that date, R[2] made two purchases of Convertible Notes,—one for $1 million at a purchase price of $650,000, or 65% of the face amount, and another for $3.36 million at a purchase price of $2,150,400, or 64% of face. Thereafter, from May 25, 1999, through August 3, 2000, R[2] made 27 purchases of Convertible Notes at prices ranging from 64.25% to 77.625% of face.[35] One purchase was

35. R[2] also engaged in two sale transactions, as shown on the list of transactions set forth below.

thereafter made in December, 2000, for $500,000 in notes at 59.25% of face, and two purchases in early January, 2001, for $1.2 million in notes at 58.125% of face. R²'s final purchase of the Convertible Notes was made on April 18, 2001, two weeks after New World Access had been petitioned into involuntary bankruptcy in Delaware and six days before the filing of voluntary Chapter 11 petitions in this Court. On that date, R² purchased $10 million in Convertible Notes at 5.275% of the face amount. R²'s purchases of Convertible Notes are set forth below:

| Date | Quantity of Convertible Notes | Price as Percent of Face Amount | Price Paid |
|---|---|---|---|
| June 10, 1998 | $1,000,000 | 100.639 | $1,006,390.00 |
| May 4, 1999 | 1,000,000 | 65.000 | 650,000.00 |
| May 4, 1999 | 3,360,000 | 64.000 | 2,150,400.00 |
| May 25, 1999 | 1,000,000 | 64.250 | 642,500.00 |
| July 1, 1999 | 860,000 | 69.250 | 595,550.00 |
| July 15, 1999 | 500,000 | 73.625 | 368,125.00 |
| July 15, 1999 | 3,620,000 | 73.711 | 2,668,338.20 |
| July 15, 1999 | 500,000 | 73.000 | 365,000.00 |
| July 29, 1999 | 1,000,000 | 74.000 | 740,000.00 |
| July 29, 1999 | 6,420,000 | 74.922 | 4,809,992.40 |
| July 30, 1999 | 1,840,000 | 76.419 | 1,406,109.60 |
| August 16, 1999 | 3,000,000 | 69.500 | 2,085,000.00 |
| August 23, 1999 | (10,000,000) | 71.500 | (7,150,000.00) |
| August 26, 1999 | (1,000,000) | 70.875 | (708,750.00) |
| September 29, 1999 | 2,000,000 | 67.000 | 1,340,000.00 |
| October 29, 1999 | 1,000,000 | 72.250 | 722,500.00 |
| November 3, 1999 | 1,200,000 | 70.750 | 849,000.00 |
| December 3, 1999 | 1,000,000 | 77.063 | 770,630.00 |
| December 6, 1999 | 1,000,000 | 76.875 | 768,750.00 |
| April 14, 2000 | 1,000,000 | 77.625 | 776,250.00 |
| May 17, 2000 | 500,000 | 76.375 | 381,875.00 |
| May 18, 2000 | 500,000 | 76.500 | 382,500.00 |
| May 19, 2000 | 705,000 | 74.625 | 526,106.25 |
| June 12, 2000 | 2,000,000 | 74.500 | 1,490,000.00 |
| June 15, 2000 | 750,000 | 73.500 | 551,250.00 |
| June 19, 2000 | 750,000 | 73.500 | 551,250.00 |
| July 19, 2000 | 1,000,000 | 71.000 | 710,000.00 |
| July 27, 2000 | 1,000,000 | 71.250 | 712,500.00 |
| July 31, 2000 | 490,000 | 70.500 | 345,450.00 |
| August 1, 2000 | 190,000 | 70.250 | 133,475.00 |
| August 3, 2000 | 780,000 | 71.125 | 554,775.00 |
| August 3, 2000 | 1,035,000 | 71.000 | 734,850.00 |
| December 19, 2000 | 500,000 | 59.250 | 296,250.00 |
| January 3, 2001 | 200,000 | 58.125 | 116,250.00 |
| January 4, 2001 | 1,000,000 | 58.125 | 581,250.00 |
| April 18, 2001 | 10,000,000 | 5.275 | 527,500.00 |
| **TOTAL** | **$41,700,000** | | 23,451,066.45 |

With respect to the Senior Notes, R² made no purchases until October 12, 2000. At that time, it was expected that New World Access would be completing a tender offer for a substantial portion of the Senior Notes. From October 12, 2000 to February 13, 2001, R² purchased $52.05 million in Senior Notes at prices ranging from 50.19% to 74.5% of face. Those purchases are set forth below:

| Date | Quantity of Senior Notes | Price as Percent of Face Amount | Price Paid |
|---|---|---|---|
| October 12, 2000 | $3,750,000 | 74.50 | $2,793,750 |
| October 17, 2000 | 1,000,000 | 71.00 | 710,000 |
| October 31, 2000 | 2,000,000 | 72.50 | 1,450,000 |

| January 9, 2001 | 3,000,000 | 68.54 | 2,056,200 |
| January 9, 2001 | 3,000,000 | 68.03 | 2,040,900 |
| January 9, 2001 | 1,250,000 | 67.50 | 843,750 |
| January 12, 2001 | 50,000 | 66.95 | 33,475 |
| January 16, 2001 | 5,000,000 | 66.88 | 3,344,000 |
| January 22, 2001 | 3,000,000 | 67.63 | 2,028,900 |
| January 23, 2001 | 5,000,000 | 65.13 | 3,256,500 |
| January 25, 2001 | 1,000,000 | 65.38 | 653,800 |
| January 26, 2001 | 1,000,000 | 64.13 | 641,300 |
| January 31, 2001 | 2,000,000 | 64.63 | 1,292,600 |
| February 6, 2001 | 1,000,000 | 63.13 | 631,300 |
| February 13, 2001 | 20,000,000 | 50.19 | 10,038,000 |
| **TOTAL** | **52,050,000** | | **31,814,475** |

Again, R[2] portfolio manager Mark Horrell,[36] who previously had been senior vice president and securities portfolio manager for a billion dollar portfolio at Liberty Bank, reviewed publicly available information in connection with R[2]'s purchases of both the Convertible Notes and Senior Notes. He testified[37] that he customarily reviewed the Debtors' 10K and 10Q reports within days after they were filed with the SEC. He further testified that in making his investment recommendations, he relied on these public filings, as well as on information obtained through conversations with Debtors' management and conversations with securities analysts monitoring the Debtors' financial affairs.

Although Horrell's analyses included credit spreadsheets that contained consolidated figures from the public filings, Horrell was aware of the corporate structure of the group and believed that substantial amounts of cash were held at both the New World Access and WATP levels. In August of 1999, he visited World Access headquarters and had discussions with management concerning the company's operations and financial affairs. He left this visit with an understanding, based on discussions with CFO Mark Gergel, that there was at the time approximately $65 million in cash held at the WATP level. His contemporaneous notes corroborate his testimony concerning these discussions.[38] Horrell also analyzed the WATP investment based on the summary financial information in the 10K's and 10Q's.

**36.** Horrell may have been technically employed by Acme Widget, an affiliate of R[2].

**37.** Horrell did not testify at trial; the parties designated and cross-designated portions of his deposition testimony. They did the same with respect to Geoffrey Raynor and Wendy Landon, discussed below.

**38.** Horrell's contemporaneous handwritten notes were received into evidence as R[2] Exhibit No. 168. The typed version of his notes was received as R[2] Exhibit No. 167. The notes contain the statement, "FACIL will be merged into the [holding company]. The bonds are in a subsidiary. The positive is that all the cash is down in the sub." Debtors and the Committee, in their written objections to designated deposition testimony, have object-

ed to Horrell's statements on pages 132 and 133 of his deposition that the bonds referred to were the Convertible Notes and that his understanding concerning cash housed in the subsidiary was derived from a conversation with CFO Mark Gergel. Their objection is stated as "Hearsay FRE 802, leading." The objection that counsel was leading the witness was waived, as no objection to form was made at the deposition. See Fed.R.Civ.P. 32. The hearsay objection concerning the conversation with Gergel is also unfounded. The statement was offered as to Horrell's understanding only, and not for the truth of the matter asserted (i.e., whether the cash was in fact housed at WATP). Both objections are therefore overruled.

In addition to the $65 million in cash referenced above, Horrell also believed in August of 1999 that approximately $50 million in cash was held at the New World Access level, resulting from a recent offering of preferred stock that was sold to Brown Bros. Harriman. During the period after August of 1999, Horrell assumed that the cash remained at these entities, inasmuch as the public filings showed that cash balances generally for the group were rising.[39] He also was aware of additional equity offerings made by New World Access during that period, and it was his understanding that any proceeds of such offerings would come into New World Access, as issuer of the stock.

Although Horrell began working at R[2] in July of 1997, he was not involved in the first purchase of Convertible Notes on June 10, 1998. He was, however, involved in every purchase thereafter until January of 2001. He was also involved in all purchases of the Senior Notes prior to his departure from R[2] on January 6, 2001. Horrell's role, with respect to both the Convertible Notes and the Senior Notes, was to perform the research and make investment recommendations; the ultimate decisions were made by Geoffrey Raynor, the president of R[2] affiliate Septor Holdings. Horrell testified that as a general practice, he summarized all of the information that he obtained through his research and investigation and communicated it to Raynor, either orally or by e-mail. Raynor testified that while he attempted to read all of Horrell's e-mails, he ordinarily communicated verbally with Horrell concerning the World Access matter. Raynor further stated that he relied on Horrell, who did all the detail work; he "reviewed everything, came by my desk, told me anything important, and we discussed it." (Raynor deposition, at 67)

As indicated above, R[2] first purchased Senior Notes in October, 2000. The purchases were made because of an impending tender offer by New World Access. R[2] knew that New World Access was required, under the terms of the indenture, to tender for a certain amount of the Senior Notes as a result of the receipt of proceeds from the sale of Telco Systems. Sometime during the fourth quarter of 2000, R[2] became aware of an issue that created uncertainty as to whether the tender would actually be made. Horrell testified that the issue related to whether New World Access could use the sale proceeds, or some portion thereof, to pay debts other than the Senior Notes. Sometime after October 31, 2000, when R[2] learned of this uncertainty, it temporarily suspended purchases of the Senior Notes.

In December, 2000, Horrell and Raynor attended a meeting in Atlanta with Jack Phillips and Tod Chmar, CEO and executive vice president, respectively, of New World Access. At that meeting, the parties discussed, *inter alia*, the issues surrounding the tender and the current and anticipated cash balances.[40] Thereafter,

---

39. Horrell Deposition, at 14 and 142–43. Debtors' and the Committee's objection to the relevant portion of testimony on page 14 of Horrell's deposition, stated as "lack of personal knowledge; speculation," is overruled. Horrell was asked what his "understanding" was concerning the cash balances other than in August of 1999. He was testifying merely as to the assumption that he had made at the time in question and what it was based on. His assumption concerning the cash balances after August of 1999 and the basis of that assumption are clearly matters within his personal knowledge; they are not intended as proof of the cash balances themselves.

40. *See, e.g.,* Horrell deposition, at 105, and Raynor deposition, at 69–70. (Debtors' and the Committee's hearsay objection to Raynor's testimony is overruled; Raynor was merely summarizing the topics of conversa-

on January 9, 2001, R[2] resumed its purchases of Senior Notes.

On the preceding day, January 8, 2001, DDJ Capital Management LLC ("DDJ"), a member of the Committee, purchased $5 million in Senior Notes. Prior thereto, DDJ held $7 million in Senior Notes, which it had obtained in exchange for Facilicom notes purchased by DDJ in Facilicom's initial offering prior to its acquisition by World Access. The decision to purchase additional Senior Notes on January 8, 2001 was made by Wendy Landon, DDJ vice president. Landon had read the indenture and was aware of the asset sale provisions requiring tender. She made the investment decision based on the proposed tender offer, the fact that the notes were trading significantly below the tender offer price, and her belief that there was sufficient cash held at the New World Access level to complete the tender. Landon had been aware of the uncertainty concerning completion of the tender. She explained, however, that a judge had ruled that the tender was required:

> We knew that the company had signaled that they might not make the tender offer, and a judge had ruled that indeed the company was required to make the

tender offer[. G]iven that we thought the company—given that the cash was on the balance sheet in the consolidated statements and the judge told—had ruled that the company must tender, we assumed that the tender offer indeed would go through.

(Landon Deposition, at 26)[41] She further stated:

> I looked at ... the 10Q for September, ... and it said consolidated, here is the cash, and it was roughly 400 million dollars in cash in [sic] short term investments of World Access, Inc. I knew there was a tender offer that was made that the judge said you had to pay. It looked like the cash was there, and I assumed that that indeed was the cash that was available to World Access, Inc.

(Landon Deposition, at 61–62)[42] Finally, Landon again stated:

> ... [A]s I said before, we bought more senior notes because there was a tender announced and we thought there was cash, and the judge said they had to pay the cash to tender the notes, and we thought, well, the judge says you have to do it, you have the cash, we should buy these....

tion and the questions that he had asked at the meeting in Atlanta.)

**41.** Debtors' and the Committee's objection to the relevance of this testimony is overruled. DDJ's reliance on the separate identity or credit of New World Access is relevant in this proceeding even though DDJ has not objected to substantive consolidation. Moreover, Debtors and the Committee have arguably waived this objection by relying on the purportedly objectionable passage in their proposed findings and conclusions. (*See* Proposed Finding of Fact No. 281).

**42.** R[2]'s hearsay objection is overruled. First, Landon was testifying as to her understanding of the information contained in the 10Q report and the information concerning the

judge's ruling on the tender offer. Those matters are not considered, at least with respect to this portion of her testimony, for the truth of the matters asserted. The Court notes, however, that there was no objection, other than relevance, to Landon's testimony on page 26 of her deposition concerning the judge's ruling on the tender offer. *See* n. 41, *supra.* Accordingly, as that relevance objection has been overruled, the testimony concerning the judge's ruling may be considered for all purposes.

R[2]'s foundation objection is also overruled. Landon clearly has personal knowledge of her own interpretation of the information described above.

(Landon Deposition, at 72–73) [43] DDJ continued purchasing Senior Notes through at least February 22, 2001, acquiring prior to the involuntary filing against New World Access a total of $26,290,000. [44]

On April 12, 2001, several months after the initial purchase of New World Access Senior Notes, DDJ purchased $10 million in WATP Convertible Notes. At that time, New World Access had already been petitioned into involuntary bankruptcy in Delaware. Landon explained her decision-making process as follows:

Q. Why did you think that purchasing the convertible notes at that time was a good idea?

MR. BAE: Objection to form. Foundation.

A. Having sat on the informal committee with William Holloway of R–Squared—as I said before, we bought more senior notes because there was a tender announced and we thought there was cash . . .

Having sat in now for a couple of months with William Holloway it became evident that he really believed that the convertible notes were senior, and so as a hedge these were trading at very low levels. I don't remember exactly what, but it was—I remember it was probably single digits.

We thought, you know what? If he believes it, we should probably buy this as a hedge because there's—there's not much down side.

(Landon Deposition, at 72–73). [45]

Another creditor holding Convertible Notes, Daiwa Securities America, joined R [2] in its opposition to substantive consolidation. Daiwa, like R [2], purchased Senior Notes during the fourth quarter of 2000. Daiwa made those purchases because of the proposed tender offer and the price at which the Senior Notes were trading. Daiwa at that time already held Convertible Notes that it had purchased from late 1999 through the spring of 2000.

On or about January 8 and 9, 2001, Daiwa sold its entire position in the Senior Notes and increased its position in the Convertible Notes. Roger Wong, who was at the time senior vice president of Daiwa's equity arbitrage group (and who later left Daiwa but then returned on July 1, 2002), made the investment decisions concerning the Senior Notes and the Convertible Notes. [46] He decided to sell the Senior

---

**43.** Debtors' and the Committee's hearsay objection is overruled. Landon's statement concerning the judge's ruling on the tender offer is not considered, at least from this portion of her testimony, for the truth of the matter asserted, but only for the purpose of Landon's understanding and her decision-making process. However, a similar statement made on page 26 of her deposition is already in evidence. *See* n. 41, *supra*. *See also* n. 45, *infra*, for ruling as to form and foundation.

**44.** As discussed further below, DDJ made one additional purchase of Senior Notes the day after the involuntary filing. It also executed three sales, each on January 9, 2001, totaling $5,000,000 face amount of notes, resulting in the net aggregate pre-bankruptcy purchases of $26,290,000 referenced above.

**45.** Debtors' and the Committee's objections to form and foundation are overruled. Landon certainly had personal knowledge of her own decision-making process, and the fact that she thought the purchase of Convertible Notes at that time was a good idea was already established by the fact that she bought them. Their hearsay objection is overruled as well. Her statement concerning Holloway's belief that the Convertible Notes were senior is not considered for the purpose of establishing either his belief or the seniority of the Convertible Notes, but only for the purpose of Landon's understanding and her decision-making process.

**46.** He testified that some of the decisions may have been made jointly with another employee in his group.

Notes in January, because he believed that the likelihood of default was materially higher at that time than it had been when Daiwa had purchased them. His belief was based on the failure of management to provide information and to issue statements concerning the logistics of effecting the tender and upon the relatively rapid drop in price of the Senior Notes, which Wong interpreted as a marketplace assessment of increased default risk.

Wong testified that when the Senior Notes were sold, he made the decision to purchase Convertible Notes because the price was low enough that in the event of default, Daiwa would still be able to make a profit. He stated that he believed that the assets largely resided at the WATP level. According to Wong's testimony, he had reviewed the public filings in connection with his purchases in 1999 and, having compared the WATP summary balance sheet with the consolidated balance sheet, had concluded that a significant portion of the assets,—in some categories more than half,—resided at the WATP level. He further testified that in connection with the January, 2001 purchase of additional Convertible Notes, he reviewed the summary WATP financial information in the third quarter 10Q report and observed that the ratio of current plus noncurrent assets to noncurrent liabilities far exceeded the threshold levels that would have otherwise signaled a problem. He testified that if the WATP current assets had fallen since the third quarter 10Q report (the last available filing) at the same rate at which they had fallen during the twelve months ended September 30, 2000, there would not have been a significant drop from the level shown in the third quarter 10Q. Wong testified, finally, that he understood WATP to be a separate entity and never considered the possibility that the obligations on the Senior Notes and Convertible Notes would be paid from the same pool of assets.

### Expert testimony: Stuart Gilson

Finally, Debtors presented the expert testimony of Professor Stuart Gilson, a tenured professor of business administration at the Harvard Business School. Gilson opined, *inter alia*, that a reasonable creditor could not have assessed the separate credit risk of WATP, because the publicly available information was insufficient for that purpose. In particular, there was no available cash flow information from which to perform a discounted cash flow analysis. According to Gilson, the discounted cash flow approach is an accepted methodology, widely used by investment bankers, hedge fund managers, mutual funds, pension funds, and other investors.

### DISCUSSION

### The Master Account.

■ The Court will first determine which estate owns the Master Account. The issue of whether an interest in property becomes property of a debtor's estate within the purview of § 541 of the Bankruptcy Code is a federal question to be decided by federal law. *See, e.g., In re Marrs–Winn Co.*, 103 F.3d 584, 591 (7th Cir.1996). However, the bankruptcy court must look to state law to determine the nature and extent of the debtor's interest in property as of the commencement of the case. *Id.; see also Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

The courts are currently divided as to the proper choice-of-law rules to apply in bankruptcy cases (or for that matter in any case where the court exercises federal question jurisdiction over claims that hinge upon state law), *viz.*, the federal choice of law rules or the conflicts rules of the fo-

rum state. *In re Gaston & Snow*, 243 F.3d 599, 605 (2d Cir.2001); *FDIC v. Wabick*, 214 F.Supp.2d 864, 869 (N.D.Ill. 2002).[47] The Seventh Circuit has not yet addressed this issue. *See In re Aircrash Disaster*, 948 F.Supp. 747, 753 (N.D.Ill. 1996). In any event, both Illinois and federal common law would most likely follow the "most significant relationship" test, as set forth in the Restatement (Second) of Conflict of Laws, *see, e.g., Gaston & Snow*, 243 F.3d at 605; *In re Aircrash Disaster*, 948 F.Supp. at 753; *Diamond State Ins. Co. v. Chester–Jensen Co.*, 243 Ill.App.3d 471, 485–86, 183 Ill.Dec. 435, 611 N.E.2d 1083 (1993), and the parties apparently agree, as they have premised their contentions on the application of that test. They reach, however, different results.

R[2] contends that Texas has the most significant relationship with this dispute, observing, *inter alia*, that the Master Account is held by Bank of America in Dallas. Debtors and the Committee, on the other hand, contend that Georgia has the most significant contacts, including the location of New World Access headquarters in Atlanta, i.e., the situs of all decisions regarding deposits and withdrawals.

The Seventh Circuit has admonished that before a court " 'entangl[es] itself in messy issues of conflict of laws [it] ought to satisfy itself that there actually is a difference between the relevant laws of the different states.' " *Jean v. Dugan*, 20 F.3d 255, 260 (7th Cir.1994) (quoting from *Barron v. Ford Motor Co. of Canada, Ltd.*, 965 F.2d 195, 197 (7th Cir.), *cert. denied*, 506 U.S. 1001, 113 S.Ct. 605, 121 L.Ed.2d

541 (1992)). With respect to this dispute, the Court is unable to identify a meaningful difference between the laws of Texas and Georgia.[48]

The Eleventh Circuit construed and applied Georgia law concerning the ownership of a bank account in *National Bank of Georgia v. Kennesaw Life and Accident Insurance Co.*, 800 F.2d 1542 (11th Cir. 1986). There, an interpleader action was filed by the National Bank of Georgia seeking a determination as to ownership of a bank account bearing the name "COMPETE Master Trust." COMPETE was an organization that provided insurance programs to small employers and their employees. Kennesaw Life and Accident Insurance Co. was one of the carriers providing insurance coverage to COMPETE's members. COMPETE was ultimately placed in receivership, and ownership of the account was claimed both by the receiver and by Kennesaw.

The district court concluded that the account presumptively belonged to COMPETE and that Kennesaw could only claim against the account to the extent it could prove that the funds therein constituted premiums collected on its behalf. Kennesaw appealed, claiming that it had rebutted the presumption of ownership and therefore had a legal right to all funds in the account. Alternatively, Kennesaw argued that if the presumption of ownership had not been rebutted, it was the equitable owner of the funds, as they had been received in trust for its benefit, and that

---

**47.** Wright and Miller state that it is actually the source of the right sued upon, and not the ground on which subject matter jurisdiction rests, that determines the governing law. 19 C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* § 4520 (2d ed.1996) (citing *Maternally Yours, Inc. v. Your Maternity Shop, Inc.*, 234 F.2d 538 (2nd Cir.1956)).

**48.** For this reason, it is not necessary to dispose of R[2]'s further (and doubtful) proposition that the ZBA Agreement and the Investment Agreement, which govern disputes between the bank and its customer, require the application of Texas law.

the district court had required an excessive amount of tracing.

 The Eleventh Circuit reversed, holding for Kennesaw on its first theory, *viz.*, legal ownership of the account. The Court stated:

> Like most states, Georgia recognizes that the name or title of a bank account creates a presumption of ownership in the titleholder. *See Granade v. Augusta Fire Dept. Credit Union*, 118 Ga.App. 157, 162 S.E.2d 870 (1968). That presumption, however, is rebuttable and ownership may be placed in some entity other than the titleholder. *See id.* 162 S.E.2d at 872.
>
> The lower court in this case acknowledged these principles in its opinion, but then failed to apply them to the evidence presented.

*Kennesaw*, 800 F.2d at 1545–46. The Court stated that the district court's approach was inconsistent with "the breadth of inquiry required by Georgia law," stressing that ownership depended not only on the name but also on the "actual operation" of the account:

> Particularly important are facts concerning which party opened the account, which party controlled the account, *see Granade, supra*, the source of the funds, *see Eagle & Phenix Mfg. Co. v. Belcher*, 89 Ga. 218, 15 S.E. 482 (1892), and their purpose, *Mayer v. Chattahoochee National Bank*, 51 Ga. 325 (1874).

*Id.* at 1546.

The Eleventh Circuit found, after reviewing the evidence presented in light of the foregoing factors, that Kennesaw had rebutted the presumption and that *"legal ownership"* of the account should therefore have been awarded to Kennesaw. *Id.* at 1545 (emphasis added). The Court further

explained that in light of this conclusion, Kennesaw's inability to trace the funds was irrelevant; as it was the legal owner of the funds, it should have been awarded the account "regardless of [its] inability to trace funds." *Id.* at 1547.

 Although there does not appear to be a decision under Texas law that articulates as precisely as *Kennesaw* the specific analysis required to determine ownership of a bank account, Texas clearly recognizes that the "nominal owner" of an account may not be the "true owner." *See, e.g., Bank One, Texas, N.A. v. Sunbelt Savings, F.S.B.*, 824 S.W.2d 557, 558 (Tex. 1992); *see also Bryant v. United Shortline Inc. Assurance Services, N.A.*, 984 S.W.2d 292, 296, 298–99 (Tex.Civ.App.1998), *aff'd*, 972 S.W.2d 26 (Tex.1998). In addition, there is a presumption that the account belongs to the entity in whose name it is held, *see, e.g., United States Fidelity & Guaranty Co. v. First National Bank of Fort Worth*, 81 S.W.2d 213, 216 (Tex.Civ. App.1935); *People's National Bank v. William Tell Lodge No. 27, I.O.O.F.*, 77 S.W.2d 929, 931 (Tex.Civ.App.1934), and as in Georgia, that presumption is rebuttable. *United States Fidelity & Guar. Co.*, 81 S.W.2d at 216; *see also Bryant*, 984 S.W.2d at 296, 298–99. Based on a review of the scant Texas law on this subject,[49] the Court concludes that the same factors would rebut the presumption as in Georgia. *See, e.g., Tompkins v. McGinn*, 85 S.W. 452, 453 (Tex.Civ.App.1905) (possession of passbook insufficient evidence of dominion to warrant finding of ownership of entire interest in joint account, distinguishing *Beaver v. Beaver*, 117 N.Y. 421, 22 N.E. 940 (N.Y.App.1889), where under bank's rules possession of passbook was sufficient to constitute control); *see also*

---

**49.** The *Kennesaw* panel, in construing Georgia law, was apparently in a similar position.

*See Kennesaw*, 800 F.2d at 1546 (citing to comparable 19th century decisions).

*Silsbee State Bank v. French Market Grocery Co.,* 103 Tex. 629, 132 S.W. 465 (1910) (control as chief evidence of true ownership); *Bryant,* 972 S.W.2d at 28–29 (recognizing ownership dispute based on source and purpose of funds); *Southwest Bank v. Calmark Asset Management, Inc.,* 694 S.W.2d 199, 201 (source and purpose); *Western Shoe v. Amarillo National Bank,* 127 Tex. 369, 94 S.W.2d 125, 127 (1936) (same).

■ In this case, the name on the Master Account is "World Access, Inc." As discussed above, that name was, until the 1998 holding company reorganization, the name of the corporation now known as WA Telcom Products Co., Inc. (i.e., WATP). After the reorganization, the name belonged to New World Access. Not surprisingly, the parties have failed to direct the Court's attention to any case involving such a peculiar twist on application of the ownership presumption.

The change of a corporation's name does not change its identity and ordinarily does not impact its property, rights, or liabilities. Although substantially more than a name change occurred during the holding company reorganization in 1998, the Court disagrees with the proposition urged by Debtors and the Committee that WATP had no existence prior thereto. It therefore seems plausible that the presumption would favor WATP, the entity that bore the name when the account was opened. However, since the presumption exists in part for the benefit of the bank (which has in this case been honoring checks of New World Access for several years), it may be arguable that the presumption should favor New World Access, as the entity that currently bears the name "World Access, Inc." For purposes of this decision, the Court will assume that the presumption favors WATP, inasmuch as it has been rebutted in any event.

Other than the first of the rebuttal factors (i.e., which party opened the account), all of the relevant considerations weigh in favor of New World Access. New World Access' corporate approval was required to fund any significant operating disbursements from the Master Account. As CFO Mark Gergel testified, the subsidiaries could not unilaterally engage in transactions in which they took money from the Master Account. Except for ordinary course bill payments, they would have to obtain approval from New World Access officers Mark Gergel, Michael Mies, or Martin Kidder.

The individuals authorized to deal with the Master Account were all employees of New World Access. Those with signature authority (i.e., Michael Mies, Mark Gergel, and Martin Kidder) were also officers and/or directors of both New World Access and WATP. With respect to wire transfers, all of the individuals with approval authority were officers and/or directors of both New World Access and WATP, with the exception of Henry Lyon. The individuals with execution authority included several employees of New World Access that had no affiliation with WATP, which was a holding company that had no employees after the October, 1998 reorganization.

R[2] contends that because those individuals who were officers and/or directors of New World Access were also officers and/or directors of WATP, they may have been exercising their authority on WATP's behalf. However, controller Henry Lyon, who had approval authority, was not an officer or director of WATP until after the Chapter 11 petitions were filed, and as indicated above, several employees of New World Access that had wire transfer execution authority had no affiliation with WATP. More importantly, however, it was the approval of New World Access, not WATP, that was required for withdrawals

from the Master Account, and it was the officers and administrative staff of New World Access, at corporate headquarters in Atlanta, that provided the high level, corporate oversight services required for the companies in the group, including essentially all of their cash management and treasury functions. Accordingly, the individuals who served as officers and/or directors of both New World Access and WATP were clearly acting, in their dealings with the Master Account, on behalf of New World Access.

Indeed, funds in the Master Account included deposits made by all the U.S. entities, not just those under the WATP umbrella. The purpose of the Master Account was to control cash and centralize the cash process for all the domestic direct and indirect subsidiaries of New World Access, the ultimate parent holding company and, as to WxC, the only parent corporation. As CFO Mark Gergel credibly testified, after the holding company reorganization, the Master Account was treated as an asset of the new parent, "because we maintained a centralized cash management system that everything flowed up to the parent company." (Transcript, at 325–26)

As for the source of the deposits, virtually all of the funds were generated either from New World Access or the operating subsidiaries (i.e., Facilicom, WATG, and WxC), as opposed to WATP. New World Access alone deposited over $500,000,000 into the account, including approximately $208 million in proceeds from various private placements and other equity financings, as well as approximately $260 million from the sale by New World Access of the stock in its direct subsidiary, Telco Systems, Inc. Other than the cash left over from the Convertible Note offering in

1997, WATP contributed virtually no cash to the Master Account until the deposit of proceeds from the sale of NACT stock, which was consummated postpetition.

Accordingly, it is clear from the evidence concerning control of the Master Account, its purpose, and the source of the funds deposited therein that true ownership was in New World Access, not WATP.

R $^2$ does not address the case law described above, governing determination of true ownership of a bank account, but premises its argument instead upon the fact that WATP opened the Master Account and never transferred the ZBA Agreement or its other agreements with the bank to New World Access. (*See* R $^2$ Response to Debtors' and the Committee's Proposed Finding of Fact No. 93.) According to R $^2$, the absence of a transfer document is the "answer" to the ownership question. *Id.* (*See also* R $^2$ Responses to Debtors' and the Committee's Proposed Findings of Fact No. 135 ("a company that never opened the account nor had it transferred to it *cannot* be the owner of the account or the cash therein")) (emphasis added) and No. 99 (referring to alleged failure to list Master Account in Assignment and Assumption Agreement as "core" of its argument).

■ However, the bank agreements govern the relationship between the bank and the depositor; they do not determine actual ownership of the deposit.[50] Indeed, adopting R $^2$'s position would in effect nullify, in cases such as this, the decisions referenced above concerning factors relevant to the ownership inquiry. If a transfer document were the "answer" to the ownership question, there would be no need for inquiry at all (especially where, as

---

50. The bank agreement establishes the contractual liability of the bank to its customer.

*See* MICHIE, Banks and Banking. Ch. IX § 1 and cases cited therein.

here, the bank agreements are not assignable in any event).

Moreover, Mies credibly explained that the bank agreements were not assigned, because management "didn't consider the need for any document. [The Master Account] was called a World Access account, controlled by World Access, accounted for as World Access account prior to the reorganization, and it was controlled by World Access, accounted for as World Access and called World Access after the reorganization." (Transcript, at 1050–51)

R[2]'s further contention concerning the FEIN on the Master Account is even less persuasive. R[2] urges that the assignment of the WATP FEIN to accounts subsequently opened in the Master Account System "is the best proof that [WATP] continued to own the [master] account." (*See* R[2] Response to Debtors' and the Committee's Proposed Finding of Fact No. 114).[51] As discussed above, however, the "best proof" consists of other factors, including control, source of the funds, and the purpose of the account. R[2] cites to no legal authority ascribing significance to the FEIN in determining ownership. At best, it may be relevant to the first factor cited in *Kennesaw*, i.e., the entity that opened the account. However, the FEIN adds little more to the inquiry than the name on the account, which establishes the rebuttable presumption.

Again, Mies explained why the FEIN was not changed at the time of the holding company reorganization, and his testimony was as credible as that concerning the bank agreements. He simply "[didn't] think it occurred to anybody. There was no particular need to change the FEIN number." Since the entities consolidated for tax purposes, it was not needed to allocate investment or interest income to the correct entity in the group; accordingly, it "didn't particularly matter what that [FEIN] number was." (Transcript, at 805–06)

Indeed, Mies never even noticed that the FEIN on the Master Account was WATP's; he learned about it after the involuntary petition was filed against New World Access in Delaware. The issue was raised by counsel in Atlanta who had been engaged to respond to the involuntary petition. Henry Lyon's testimony concerning discovery of the FEIN at about the time of the bankruptcy filing was equally credible, as was his explanation that the Master Account was originally included on the WATP schedules of assets, rather than those of New World Access, because he was under the impression that the FEIN would control as to ownership.

R[2] portrays the initial inclusion of the Master Account on the WATP schedules as a significant admission, critical to the ownership question. However, "asset schedules are far from infallible," *ITOF-CA, Inc. v. MegaTrans Logistics, Inc.*, 322 F.3d 928, 932 (7th Cir.2003), and statements therein are merely evidentiary matters to be weighed with all other evidence; they do not alone stand as the truth. That is particularly true here, where other statements included in the same and related documents give rise to different inferences as to ownership. As discussed above, an exhibit to WATP's schedules listed the Master Account as a "World Access/WA Telecom Products" account, and in the Statement of Financial Affairs for WATG filed the same day as the WATP schedules, another account in the Master Account System was described as

---

**51.** It should be noted, however, that the WATP FEIN was assigned to accounts held by entities that were not even under the WATP umbrella. R[2] states that the number was "dutifully" assigned to all entities; in truth, it was "automatically" assigned to them.

"a WAXS [i.e., World Access, Inc.] account bearing the tax identification number of WATP." The Cash Management Motion also referred to the Master Account as an account of New World Access, but attached an exhibit referring to it as a "World Access/WA Telecom Products" account. Mies credibly testified that these varying and inconsistent designations of Master Account ownership after the filing of the petitions stemmed from the confusion and uncertainty created by discovery of WATP's FEIN on the Master Account. Under the circumstances, any probative value of the admission urged by R² is undermined, if not negated, by the contemporaneous statements in the same and related documents giving rise to contrary inferences of ownership.

■ Finally, R² contends that New World Access is not entitled to any funds in the Master Account unless they can be traced to New World Access' deposits. R² states, for example, that Debtors and the Committee "adduced no evidence tracing the origins of the cash in the Master Account as of the Petition Date," and that "[b]y contrast, R² presented evidence indicating that almost half of the Funds in the Master Account came from WATP's sale of shares of its NACT subsidiary." (See R² Proposed Findings of Fact Nos. 192 and 193; see also R² Proposed Findings of Fact and Conclusions of Law No. 276.)

However, since New World Access is the true owner of the Master Account, the tracing and identification of its funds therein as of the filing of the petition or any other date is unnecessary and indeed irrelevant. As the Eleventh Circuit observed in *Kennesaw:*

The district court found a presumption of ownership in favor of COMPETE and immediately proceeded to evaluate Kennesaw's claim to the funds on a trust fund tracing theory. Had the district court properly considered Kennesaw's rebuttal evidence on the purpose of the account and Kennesaw's control over it, the presumption in favor of COMPETE would have dissolved. All of the facts and circumstances surrounding the operation of the account indicate that it belonged to Kennesaw. Thus, the district court erred in not awarding Kennesaw the account, *regardless of Kennesaw's inability to trace funds.*

*Kennesaw,* 800 F.2d at 1547 (emphasis added). As New World Access has likewise rebutted the presumption, it is the true owner of the account, and its ability to trace funds therein as of the Petition Date (or any other date) is irrelevant.

The fact that other Debtors might be able to trace their deposits to funds in the Master Account as of the Petition Date is, on the record established in this case, likewise irrelevant. As indicated above, R² emphasizes that the funds currently on deposit include substantial amounts derived from the sale of WATP's shares in NACT. As for the remaining entities in the group, Debtors and the Committee go so far as to predict that unless consolidation is granted, there will be "an onslaught of litigation by each entity in an attempt to trace cash into and out of the Master Bank Account," *see* Debtors' and the Committee's Proposed Finding of Fact No. 144, which "will require this Court to determine a myriad of insolvency issues for each point in time an allegedly fraudulent transfer occurred and to determine which of the many tests (*e.g.,* lowest intermediate balance rule, FIFO, LIFO) is appropriate for this situation." (*See* Debtor's and the Committee's Response to R² Finding of Fact No. 192.)

Again, on the record established in this case, tracing is irrelevant, inasmuch as the other Debtors stand in a debtor/creditor relation to New World Access with respect

to the Master Account. *See In re Amdura Corp.*, 75 F.3d 1447, 1452 (10th Cir.1996); *see also Southmark Corp. v. Grosz (In re Southmark Corp.)*, 49 F.3d 1111, 1117–18 (5th Cir.1995). In *Southmark*, a parent corporation sought to avoid as preferential a payment made from its concentration (i.e., master) account to an officer of one of the subsidiaries that participated in the group's cash management system. The district court ruled that funds in the concentration account were held in constructive trust for the subsidiary and therefore did not constitute property of the parent for preference purposes. *See* 11 U.S.C. § 547(b). The Fifth Circuit reversed, observing:

> ... [I]t is important to distinguish generally between two types of "equitable interests." In a contractual (or debtor-creditor) relationship, the creditor may possess an "equitable claim" to property actually owned by the debtor, but there is no division of ownership or title in the property at issue; the debtor is entirely free to dispose of the property as he sees fit. In a trust relationship, by contrast, the law actually divides the bundle of rights in the property; the trustee holds legal title while the beneficiary possesses an equitable title or property interest.

*Id.* (citations omitted). When the trustee of a constructive or other trust becomes insolvent, the beneficiary is entitled to receive all identifiable trust property from the trustee's estate; " '[t]he general creditor, on the other hand, having no property interest in the assets owned by his debtor, must accept merely a dividend.' " *Id.* at 1118 (*citing* George G. Bogert & George T. Bogert, *The Law of Trusts and Trustees*

§ 17, at 216–17 (2d rev. ed. 1984)) Applying Texas law, the Fifth Circuit found that there was no basis for imposing a constructive trust as to the subsidiary's funds in the concentration account. Accordingly, the subsidiary was merely a general creditor of the parent's estate, and the funds paid to the subsidiary's officer were therefore property of the parent's estate for preference purposes.

The Tenth Circuit reached a similar conclusion in *Amdura*. There, the "sole issue" before the Court was "the ownership of funds deposited by a subsidiary into a parent corporation's cash management bank account." *Amdura*, 75 F.3d at 1449. The parent recorded all funds received in the concentration account from the subsidiaries as debts owed by the parent, and it recorded all funds expended from that account on behalf of the subsidiaries as debts owed by the subsidiaries. The subsidiary in question had a positive cash balance in the account and sought turnover of the funds from the parent on two grounds, i.e., that it had rebutted the presumption arising from the parent's name on the account and therefore owned the funds outright or, alternatively, that it was the equitable owner of the funds on a constructive trust basis.

The Tenth Circuit first ruled that the claim of "outright" ownership failed because the name presumption (which went to the parent corporation in that case) had not been rebutted; all other legally cognizable indicia of ownership (including "complete control") were held by the parent. The Court then rejected the constructive trust claim,[52] noting that under Colorado law, "some kind of abuse or unjust enrich-

---

**52.** In *Amdura*, the court went on to consider the constructive trust claim because the subsidiary did not rebut the presumption, thereby failing to sustain its claim of "outright" ownership. In *Kennesaw*, on the other hand, there was no need to consider the constructive trust claim, because the presumption *had* been rebutted, thereby establishing "legal" (i.e., outright) ownership of the account in Kennesaw. *Kennesaw*, 800 F.2d at 1545.

ment must be shown." *Id.* at 1452. The subsidiary attempted to meet that standard by, *inter alia,* contending that the parent had abused a confidential relationship, resulting in unjust enrichment. The Court held:

> There is nothing in the record to support [the subsidiary's] suggestion that the transfer of lockbox funds into the concentration account, at all other times a routine procedure, became on the eve of bankruptcy an attempt to plunder [the subsidiary's] corporate assets. Nor is there evidence of other misbehavior on [the parent's] part.
>
> ... [The subsidiary] cannot meet [its] burden merely by imputing evil intent to a business arrangement in which it willingly participated and to which it did not object prior to filing for bankruptcy.

*Id.* Accordingly, the subsidiary had no property interest in the concentration account and was merely a general unsecured creditor to the extent of its positive cash balance.

 Here, as in *Amdura* and *Southmark,* there is nothing in the record to support a finding of constructive trust[53] under either Georgia or Texas law. Nothing in the operation of the Cash Management System, including the daily sweeping of the zero balance accounts of the subsidiaries, amounted to breach of a confidential relationship or "misbehavior" of any kind, much less fraud or wrongdoing. *See, e.g., In re Sheetex,* 1999 WL 739628 (Bankr. M.D.Ga.); *Haber Oil Co. v. Swinehart (In re Haber Oil Co.),* 12 F.3d 426, 436 (5th Cir.1994); *Mowbray v. Avery,* 76 S.W.3d 663, 681 (Tex.Civ.App.2002). As in *Amdura,* all cash inflows to and outflows from the Master Account were recorded for intercompany purposes and designated as debits or credits, so that the net intercompany payables or receivables could be ascertained.[54] The daily transfer of funds, together with the corresponding accounting entries, was, as in *Amdura,* "at all ... times a routine procedure" and an integral part of a business arrangement in which the companies had willingly participated for years prior to bankruptcy. Indeed, in the Debtors' Cash Management Motion filed on the first day of these bankruptcy cases, they sought authorization to continue the Cash Management System as well as to continue to engage in intercompany transactions related, *inter alia,* to the utilization of funds therein. They referred to the intercompany balances arising from the intercompany transactions as "extensions of intercompany credit" (Debtors' and the Committee's Exhibit No. 53, at 7–8) and sought and obtained authority to continue such credit transactions postpetition.

Under the circumstances, New World Access stands in a debtor/creditor relation to the other Debtors with respect to the Master Account; there is, on the record presented, no trust relationship and no division of the "bundle of rights" therein. *See Southmark,* 49 F.3d at 1117–18. Tracing, therefore, is irrelevant. The account is owned by New World Access, and any intercompany transactions arising from its operation are merely unsecured claims.[55]

---

**53.** Nor is there a basis for finding an express or resulting trust with respect to the Master Account.

**54.** *See also* Debtors' and the Committee's Proposed Finding of Fact No. 139 ("Whenever the World Access entities transferred cash amongst themselves, those transfers were treated as intercompany transactions" and were "recorded ... as intercompany payables and receivables.")

**55.** Pursuant to orders entered on the Cash Management Motion, however, most or all of the *post* petition transactions have been granted superpriority and/or secured status under § 364(c).

## The law of substantive consolidation.

 Turning to the question of substantive consolidation, the Court notes that the doctrine derives from the bankruptcy court's equity powers as expressed in § 105.[56] Its purpose is to ensure the equitable treatment of all creditors. *Eastgroup Properties v. Southern Motel Assoc., Ltd.*, 935 F.2d 245, 248 (11th Cir. 1991); *In re Augie/Restivo Baking Co.*, 860 F.2d 515, 518 (2d Cir.1988). The effect of substantive consolidation is, *inter alia*, the pooling of the assets and liabilities of the consolidated entities and the satisfaction of claims from the common fund. As a result, intercompany claims are eliminated and wealth is redistributed among the creditors of the various entities, because every entity is likely to have a different asset-to-liability ratio. *See, e.g., Augie/Restivo*, 860 F.2d at 518; *In re Auto-Train Corp., Inc.*, 810 F.2d 270, 276 (D.C.Cir.1987); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 618 (Bankr. D.Del.2001). Because of the dangers of forcing creditors of one debtor to share equally with creditors of a less solvent debtor, "substantive consolidation 'is no mere instrument of procedural convenience ... but a measure vitally affecting substantive rights....'" *Augie/Restivo*, 860 F.2d at 518 (citations omitted). Accordingly, courts generally hold that it is to be used sparingly. *In re Bonham*, 229 F.3d 750, 767 (9th Cir.2000).[57]

 The substantive consolidation inquiry is highly fact-intensive, and the standards to be applied are to some extent unsettled. The parties in this case have presented their factual and other evidence with a view primarily to the two Circuit Court tests espoused in the *Auto-Train* and *Eastgroup Properties* cases, on the one hand, and the *Augie/Restivo* case, on the other. In *Eastgroup Properties*, 935 F.2d at 249, the Eleventh Circuit adopted and elaborated upon a substantive consolidation standard enunciated by the District of Columbia Circuit in *Auto-Train*, 810 F.2d at 276. The Court first stated that a searching inquiry must be conducted "'to ensure that consolidation yields benefits offsetting the harm it inflicts on objecting parties'" (*quoting* from *Auto-Train*, 810 F.2d at 276), and then set forth the following standard:

> ... [T]he proponent of substantive consolidation must show that (1) there is substantial identity between the entities to be consolidated; and (2) consolidation is necessary to avoid some harm or to realize some benefit.... When this showing is made, a presumption arises "that creditors have not relied solely on the credit of one of the entities involved." ... Once the proponent has

---

56. There is no specific statutory authority for substantive consolidation. The only Code provisions that relate to it are § 302(b), which directs the court in a joint case filed by spouses to determine the extent, if any, to which the estates should be consolidated, and § 1123(a)(5)(C), which authorizes the inclusion in Chapter 11 plans of provisions for the "merger or consolidation of the debtor with one or more persons."

57. Although certain courts have observed a "modern" trend toward more "liberal" application of the doctrine, *see, e.g., In re Murray Industries, Inc.*, 119 B.R. 820, 828 (Bankr.

M.D.Fla.1990), this Court is skeptical of the "liberal" approach. In this regard, Collier makes the following observation:

> Because this area of the law is based strictly on equitable principles without a statutory basis, it will continue to evolve. In this area, however, the potential harm to innocent creditors on which the [Second Circuit's] admonition was based should continue to give the courts pause before expanding the doctrine, despite the modern trend.

2 L. King, *Collier on Bankruptcy* ¶ 105.09[1][d] (15th ed.2003).

made this prima facie case for consolidation, the burden shifts to an objecting creditor to show that (1) it has relied on the separate credit of one of the entities to be consolidated; and (2) it will be prejudiced by substantive consolidation.... Finally, if an objecting creditor has made this showing, "the court may order consolidation only if it determines that the demonstrated benefits of consolidation 'heavily' outweigh the harm."

*Eastgroup Properties*, 935 F.2d at 249 (citations omitted). The Court also noted that a creditor who establishes reliance in fact may nonetheless be estopped from asserting it as a defense to consolidation where, under similar facts, a reasonable creditor would not have relied on the separate credit of the entity. *Id.* n. 11.

Finally, the Court stated that the proponent, in making the prima facie case described above, "may want to frame his argument using the seven factors outlined in *In re Vecco Construction Industries, Inc.,* [4 B.R. 407, 410 (Bankr.E.D.Va. 1980)]," as follows:

(1) The presence or absence of consolidated financial statements.

(2) The unity of interests and ownership between various corporate entities.

(3) The existence of parent and intercorporate guarantees on loans.

(4) The degree of difficulty in segregating and ascertaining individual assets and liabilities.

(5) The existence of transfers of assets without formal observance of corporate formalities.

(6) The commingling of assets and business functions.

(7) The profitability of consolidation at a single physical location.

*Eastgroup Properties,* 935 F.2d at 249.[58] The Court stressed, however, that the specific factors were merely examples of information that might be useful in determining whether there was a substantial identity between the entities and whether consolidation was necessary to avoid some harm or realize some benefit; further, any of the factors might support either element of the prima facie case, or both, depending on the circumstances. *Id.* at 250 n. 14.

The Second Circuit, in *Augie/Restivo*, established a somewhat different standard for adjudicating substantive consolidation requests. The Court concluded that the various elements listed above, and others considered by the courts, "were merely variants on two critical factors: (i) whether creditors dealt with the entities as a single economic unit and 'did not rely on their separate identity in extending credit,' ... or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors." *Augie/Restivo*, 860 F.2d at 518 (citations omitted). With respect to the first factor, the Court explained that creditors who make loans on the basis of a particular borrower's financial status expect to be able to look to the assets of that borrower for repayment and that such expectations create significant equities. *Id.* at 518–19. With regard to the second factor, the Court stated:

... [E]ntanglement of the debtors' affairs involves cases in which there has

---

58. The *Eastgroup* Court stated that additional factors which might be presented include "(1) the parent owning the majority of the subsidiary's stock; (2) the entities having common officers or directors; (3) the subsidiary being grossly undercapitalized; (4) the subsidiary transacting business solely with the parent; and (5) both entities disregarding the legal requirements of the subsidiary as a separate organization." *Eastgroup Properties,* 935 F.2d at 250 (*citing Pension Benefit Guaranty Corp. v. Ouimet Corp.,* 711 F.2d 1085, 1093 (1st Cir.1983)).

been a commingling of two firms' assets and business functions. Resort to consolidation in such circumstances, however, should not be Pavlovian. Rather, substantive consolidation should be used only after it has been determined that all creditors will benefit because untangling is either impossible or so costly as to consume the assets.

*Id.* at 519. The Court further explained that commingling can justify consolidation only where "the time and expense necessary even to attempt to unscramble [the assets and liabilities is] so substantial as to threaten the realization of any net assets for all the creditors," ... or where no accurate identification and allocation of assets is possible. In such circumstances, all creditors are better off with substantive consolidation.

*Id.* (citations omitted)

The *Augie/Restivo* test was recently adopted by the Ninth Circuit in *In re Bonham*, 229 F.3d 750, 767 (9th Cir.2000). The Court found the Second Circuit's approach to be "more grounded in substantive consolidation and economic theory" as well as "more easily applied." *Id.* at 766. While this Court agrees that the *Augie/Restivo* standard is truer to the principles that gave rise to the doctrine, there is no need to choose in this case between the *Augie/Restivo* standard and the *Eastgroup Properties* test, as Debtors and the Committee have failed to establish entitlement under either standard.

**Application of Eastgroup Properties.**

 Under *Eastgroup*, Debtors and the Committee have failed to establish a prima facie case of substantial identity between the entities and necessity of consolidation to avoid some harm or realize some benefit. First, the evidence with respect to the Debtors' trade vendors related largely to WorldCom and AT & T. As indicated above, WorldCom maintained separate contracts with the operating Debtors and other operating subsidiaries in the World Access group. It also maintained separate invoicing accounts for the operating Debtors and billed them separately. The operating Debtors, in turn, separately billed and accounted for their transactions with WorldCom.

AT & T separately invoiced WxC and other members of the World Access group, and although it ultimately began mailing all of its invoices to WxC for processing, the usage by WxC and other entities continued to be separately tracked by AT & T.

Louis Dudney's expert testimony further supports the conclusion that vendors dealt with the Debtors as separate entities. He testified concerning sample transactions that he had reviewed in which, *inter alia*, several vendors invoiced one Debtor as a separate entity or one vendor separately invoiced several of the Debtors. He stated that these transactions and the others that he described were representative of many of the other transactions that he had reviewed.

Although Tod Chmar, executive vice president of New World Access, testified that he had discussions with vendors and customers of the various entities on a global basis, he acknowledged that such discussions occurred at his level only occasionally, in the acquisition context. Michael Mies similarly testified that he dealt with creditors or vendors on behalf of the subsidiaries "periodically," e.g., to secure credit or renegotiate credit terms. The fact that officers of New World Access occasionally conducted high level negotiations with trade vendors is neither unusual nor particularly probative on the issue of substantial identity.

Importantly, there is no reason to believe, and nothing in the record to suggest,

that such occasional high level negotiations led vendors to believe that other entities in the Debtors' group would share responsibility for their affiliates' obligations. Indeed, despite Steven Rubio's general statements that billing and related activity with respect to WorldCom was managed, for the World Access operating subsidiaries, by one senior management team at New World Access, any such high level involvement clearly did not translate into "substantial identity" from WorldCom's point of view. If it had, WorldCom would not have felt the need to seek a guaranty by New World Access of WxC's obligations under the proposed new consolidated service agreements. In fact, Rubio recalled that without the New World Access guaranty, WorldCom would not operate under the consolidated WxC agreements.

The Debtors' identity as separate corporations responsible for their own obligations was further reinforced when they distributed to their vendors the letter announcing a buying consortium among World Access, WxC, Star Telecommunications, and their affiliates. The letter carefully defined the term "Companies" to include all of these companies and their affiliates as listed in an attachment to the letter. The letter stated that each of the "Companies" would "continue to be solely responsible" for telecommunications services purchased from the vendors and that "none of the Companies [would] be responsible for any obligations or liabilities of any of the other Companies." Debtors and the Committee now attempt to disavow the plain meaning of this language by contending that the term "Companies" actually referred to three *groups* of companies, i.e., World Access and its affiliates, pre-merger WxC and its affiliates, and Star Telecommunications and its affiliates. In light of the carefully crafted language of the letter, this contention is thoroughly unconvincing. Indeed, Mr.

Chmar ultimately retreated from his testimony on cross-examination, when he stated, "I mean, it's unclear to me reading this letter right now what that means." (Transcript, at 259)

Debtors rely greatly on their internal integration efforts, including integration of the networks and the backroom systems, to establish their prima facie case under *Eastgroup*. As discussed above, when companies were acquired, efforts were made to eliminate duplication in the networks, e.g., by retiring an older existing switch, where traffic loads permitted, in favor of two newer Facilicom switches. Debtors and the Committee attempt to suggest, by referring to the "merger" of networks, that ownership of the various segments of the network was also somehow merged. That is, however, clearly not the case. There was no commingling as to ownership of the various switches and other equipment retained, and if calls were trafficked across a Facilicom switch, it was Facilicom that recorded the revenue. Debtors' and the Committee's own hypothetical—the Chicago/Salzburg call illustrated in their Demonstrative Exhibit No. 503, makes that clear. If a call came in through a WxC customer, it was WxC who billed the customer, even if portions of the call were handed off to other companies in the group; WxC would then simply owe its affiliates for the services they had provided on their portions of the network. Indeed, calls were sometimes handed off to other carriers that were not part of the World Access group at all, and such carriers would likewise be owed for the services provided on their networks.

The evidence concerning brand names, logos, and other means of identification further undermines Debtors' and the Committee's attempt to establish a prima facie case. There are countless documents in evidence, including invoices, checks, and

letters, demonstrating that the operating Debtors routinely used their own names and logos. The addition, in some of these documents, of the phrase "A World Access Company" merely serves to notify that the debtor is a member of the World Access corporate group; it does not portray the company as a mere division or in any way misguide as to corporate separateness.

Moreover, Debtors and the Committee have conceded that the operating Debtors, after their acquisition by World Access, continued to be operated under their own names. (See Debtors' and the Committee's Response to R $^2$ Proposed Finding of Fact No. 14). In fact, Henry Lyon testified that as late as June of 2000, WxC and Facilicom were still competing in certain markets. Debtors and the Committee nonetheless contend that "the companies were moving toward their stated intention of achieving a single brand identity" (Response to R $^2$ Proposed Finding of Fact No. 14) and that they "engaged in a business ... whose goal was to achieve a substantial identity between the entities as a single integrated business...." (Debtors' and the Committee's Proposed Finding of Fact No. 205) While that may have been their goal, it was simply not achieved during the period prior to the filing of these cases.

It is true that certain of the factors set forth in *Eastgroup Properties* as potential-

ly relevant to the required prima facie showing are present here. The Debtors published consolidated financial statements (although separate condensed information was also available for New World Access, as well as for WATP (combined with its subsidiaries)); they filed consolidated tax returns; there is unity of ownership; the companies have overlapping officers and boards of directors; and there are inter-corporate guaranties (including, *inter alia,* the guaranty by New World Access of the Convertible Notes) and a centralized cash management system. These phenomena are, however, quite common in today's corporate groups. The same is true of the high level corporate oversight services that New World Access officers and administrative staff provided with respect to cash management, insurance, tax compliance, and legal functions.

While these factors have some relevance to the propriety of consolidation, other more important factors have not been established in this case, including the commingling of assets, poor record keeping causing great difficulty in the segregation of individual assets and liabilities, and transfers made without formal observance of corporate formalities. *See, e.g., Eastgroup Properties,* 935 F.2d at 249; *see also* 2 L. King, *Collier on Bankruptcy* ¶ 105.09[2][a] (15th ed.2003).[59]

---

**59.** Collier notes, in this regard, as follows:

A combination of elements showing a substantial relationship among the debtors is a predicate to substantive consolidation, but the existence of such a relationship alone will not support substantive consolidation. For example, many of the elements are present among affiliated companies. Common ownership or a parent/subsidiary relationship, common directors and officers, inter-affiliate transfers, incorporation caused by the parent, the existence of inter-corporate claims, and consolidated financial statements or tax returns are all typical of most affiliated corporations, yet

substantive consolidation is not typically ordered on the presence of the close corporate relationship represented by these elements. Additional elements are required.
2 L. King, *Collier on Bankruptcy* ¶ 105.09[2][a] (15th ed.2003). Collier goes on to state that the most common group of additional elements that will result in consolidation are poor record keeping or commingling of separate assets and liabilities and intercompany transactions, such that it would be prohibitively expensive or impossible to sort out a proper allocation. *Id.*

Debtors' own officers repeatedly admitted that the Debtors' books and records were properly maintained. First, corporate controller Henry Lyon acknowledged that the integration of the accounting systems onto one software platform did not mean that the entities stopped keeping their own records. Separate books and records, including separate general ledgers, continued to be maintained for Facilicom, for WxC, and for the operating divisions of WATG. Although New World Access and WATP shared the "corporate" general ledger, there were separate accounts for WATP maintained within that ledger.

Balance sheets were prepared on a subsidiary-by-subsidiary level to facilitate the consolidation of financial information for the group's financial statements. While "full-blown" financial statements for the subsidiaries were not maintained in the Debtors' files, such statements could be generated from the accounting information that was available. Lyon acknowledged that his accounting group made every effort to maintain the subsidiaries' financial information in accordance with GAAP.

Mark Gergel also acknowledged that both before and after the holding company reorganization, during his tenure as CFO, World Access maintained sufficient internal accounting controls to accurately account for its assets and the assets of its subsidiaries, as well as for intercompany transactions. With respect to intercompany transactions, Lyon explained that there were several types, including the movement of cash between the entities, direct payments by one entity on behalf of another, and transactions relating to intercompany traffic, all of which were recorded on the ledgers. Gergel likewise testified that "[e]very time there was a transaction between subsidiaries or between a parent company and a subsidiary, each of the companies would make appropriate entries in their general ledger with one of the entries always intercompany account." (Transcript, at 350) In particular, Gergel stated that all cash inflows to and outflows from the Master Account were recorded for intercompany purposes.

Treasurer Michael Mies testified that the companies accounted for the sources and uses of cash as it flowed through the Master Account System, generating reports that grew more detailed and regular over time, until they were generated daily during the period prior to bankruptcy. Mies stated that during that period, he was not aware of any situation where cash was received by one of the entities but booked by another.

Reconciliation of intercompany balances was performed monthly, and Lyon acknowledged that intercompany accounts were in balance in all material respects through December 31, 2000.

Though not necessary to this decision, the Court notes that Louis Dudney's expert testimony concerning the Debtors' records was to the same effect. He opined, *inter alia*, based on his review and tracing of over 2,000 transactions, that books and records were separately maintained for WxC, Facilicom, for each of the divisions within WATG, and for "corporate" (i.e., the general ledger shared by New World Access and WATP). He further opined that the intercompany transactions among them were separately accounted for and that their assets and liabilities were therefore separate.

In spite of this extensive testimony, as well as other evidence, establishing the integrity of the Debtors' books and records, Debtors and the Committee made every effort to bring to the Court's attention any identifiable imperfections. First, they stressed the issue of costing for intercompany service transactions, which arose

during the integration of the billing systems. As discussed above, one aspect of this problem involved discrepancies, as among the operating entities, in the rates applied to segments of telephone calls trafficked across the network. The inconsistencies resulted in part from the fact that the acquired companies had diverse billing practices which had not yet been totally harmonized and also from the fact that some of the costing tables had not been updated. Henry Lyon testified that another aspect of the costing problem involved "minute issues," i.e., instances in which the amount billed for services by one subsidiary differed from the cost booked by the purchasing subsidiary because the number of minutes of usage differed (as opposed to the rate applied).

Lyon indicated that minute issues may have begun to surface in approximately January, 2001. If that was the case, then the minute issues would only have affected the records for three months. Moreover, Lyon was not even certain that minute issues existed.[60]

More importantly, Lyon acknowledged that efforts were being made to correct the problem. Indeed, Bobby Vannoy, "one of the key IT people" with responsibility for the billing system, believed the costing data issues were resolved by mid-March, 2001. Although Lyon was more skeptical, he was not certain that the system had not been fixed. He was only certain that "if the system was fixed at some point late in the game, it was never retroactively fixed." (Transcript, at 613). In any event, it is clear from his April 6, 2001 e-mail memorandum (quoted *supra*) that he anticipated a resolution of the issue in the near term. Although he had no definitive idea as to the time frame, he thought it worthwhile

to "wait a few more days" to see if the issue was resolved before posting the intercompany bills and doing a consolidation.

Finally, even if corrective measures are still required, Lyon acknowledged that all of the call detail recorded by the Debtors' systems still exists. Walter Burmeister, who estimated the group's annual calls at 1.5 billion per year, generating in excess of five billion records, also testified that the call detail for all these calls still exists.

As discussed above, Lyon also testified as to certain other issues that might affect standalone financial statements for the separate entities, including reserves recorded at the consolidated level that actually related to the subsidiaries, intercompany cost allocations that had not been updated, and lack of uniformity in recording intercompany interest charges. There was little evidence as to the specifics or extent of these issues or the amount of work that would be required to make any necessary adjustments.

Lyon further testified that the Debtors did not allocate overhead charges amongst themselves and that the failure to do so could make one entity's operating results appear, on a stand-alone basis, artificially inflated at the expense of the entity that bore the administrative costs. As discussed above, Peltz testified that more than $1 billion in prepetition overhead had not yet been reconciled or allocated in the Debtors' books and records, consisting largely of one single charge in the amount of $711 million for good will amortization. Peltz, however, admitted that he was not in a position to opine that the $711 million even needed to be allocated to any entity other than World Access; he could only state that it was "a big number that bears

---

**60.** As discussed above, Lyon admitted that he did not "know what all the drivers were for the costing issues, whether it's solely unit or whether there was actually segments missing from those calls and not being costed properly." (Transcript, at 585)

investigation." (Transcript, at 1390). As to other significant components of the unallocated overhead, Peltz stated that "other than identifying [them] as *potentially* allocable items," he'd "done no further work." (Emphasis added) (Transcript, at 1391)

Again, though not necessary to this decision, the Court notes that Dudney viewed the unallocated overhead identified by Peltz as a non-issue. He stated that allocation of the good will charge,—if allocation were even necessary,—could be accomplished in just a few hours. He also testified that there were only six accounts that made up approximately 92% of the total overhead amount and that the fewer accounts there are to allocate, the simpler the task.

The Court concludes that these issues, like the intercompany costing issues, can be resolved (to any extent necessary) without significant expense or delay. While Debtors and the Committee attempt to portray these issues as formidable obstacles to a proper reconciliation of separate assets and liabilities, they clearly are not; they are merely imperfections in a sophis-

ticated system of accounting records that were conscientiously maintained.

Again, all the relevant accounting data, as well as all the relevant call detail from the Debtors' powerful billing and information systems, still exist. That is not to suggest, however, that the hundreds of thousands of accounting entries and billions of call records will have to be examined, as urged by Debtors and the Committee. Indeed, the Court will not countenance such an unnecessary and duplicative investment of time and expense.[61] Although, as Henry Lyon suggested, the issues discussed above might prevent the subsidiaries' financials from constituting "GAAP" statements, perfection is not the standard in the substantive consolidation context. A reasonable review to make any necessary adjustments is all that should be required or authorized.[62]

For all of these reasons, Debtors and the Committee have failed to establish a prima facie case of substantial identity between the entities and necessity of consolidation to avoid some harm.[63]

---

61. For similar reasons, the Court finds Peltz' $25 million estimate for "legal/professional/consulting fees" in stand-alone liquidations, derived simply as a multiplication of five times the cost of a single consolidated administration, to be unsupported and excessive.

62. The Court further notes that the sharing of the corporate general ledger by New World Access and WATP does not present a material obstacle to the identification of their separate assets and liabilities. Lyon testified that separate accounts were maintained within the corporate ledger for WATP, and it was Dudney's view that the separate accounts would provide a basis for segregation of the ledger. In addition, since the Master Account is owned by New World Access, the many transactions related thereto are transactions of New World Access, and not of WATP. Finally, but perhaps most important, there was little, if any, intercompany activity between the two holding

companies. In fact, Debtors and the Committee have conceded that there are no intercompany transactions between New World Access and WATP in their Proposed Finding of Fact No. 233. *See* discussion, *infra*.

63. In light of the Court's conclusions, it is unnecessary to consider whether certain substantial offsets made by WorldCom shortly before the commencement of these cases were nonmutual or for any reason recoverable by one or more of the Debtors herein (a factor which would weigh against consolidation). R[2] contends that the offsets were nonmutual, involving credits given by WorldCom for amounts owed to it by WATG in exchange for releases of WorldCom payables owed to Facilicom. Debtors and the Committee contend that the offsets were mutual, relying in part on their assertion that certain revenues belonging to WATG pursuant to its Carrier Services Agreement with WorldCom "mistaken-

With respect to the benefit inquiry (i.e., whether consolidation is necessary to realize some benefit), Debtors and the Committee relied largely upon Peltz' liquidation analyses. Through his testimony, they attempted to establish that consolidation will benefit *all* creditors, because the percentage recovery in a substantive consolidation (Peltz Scenario I) would be greater than the respective recoveries in stand-alone liquidations (Scenario II). Peltz' analysis fails, however, to establish a prima facie case of such benefit.

First, Peltz substantially overestimated the values of certain assets. As noted by DenUyl, the $53,956,141 in accounts receivable included in Scenario I is $23,956,141 higher than the estimate that Debtors themselves made in their Disclosure Statement. Peltz admitted that he did not do a litigation analysis with respect to these receivables, but merely reviewed them and relied on discussions with Debtors' employees responsible for collections. His figure appears to be highly speculative and overly optimistic; indeed, it includes an estimated recovery on certain receivables (those not already in litigation, due from bankrupt entities, or used as offsets) as high as 80%, i.e., a 95% recovery rate less 15% in collection charges.

Peltz' estimate for the liquidation of "other assets," including an estimated $20 million from "other causes of action," is also substantially unsupported and overly optimistic. Peltz admitted that the estimation of recoveries from such suits would be a difficult and speculative task. Moreover, in arriving at the $20 million figure, he assumed full recovery by World Access on its D & O insurance policy, based merely on information provided by Committee counsel. There is nothing, however, in the record to suggest that World Access would be entitled to full recovery,—or indeed any recovery,—under the D & O liability policy.[64]

When Scenario I of Peltz' analysis is adjusted to reduce the estimate for receivables collections to $30 million and to eliminate the highly speculative $20 million included in "Other Assets," the "Total Estate Proceeds Available" is reduced to $108,915,163. After deducting Peltz' estimated administrative expenses and priority and secured claims, the net assets available for distribution in a consolidated liquidation are $97,640,689. This figure results in a recovery percentage of approximately 10.84% in consolidation.

With respect to the debtor-by-debtor liquidation analyses, the Court declines to adopt DenUyl's, because, *inter alia*, it is

---

ly" migrated at some point to Facilicom's books. The Court notes, however, that although WATG was the party to the Carrier Services Agreement identified by Debtors, Dudney testified that it was Facilicom that bore the costs associated with the forgiven invoices. It is not at all clear from the record to what extent there was a "migration" of revenue from WATG's books to Facilicom's books (Lyon did "not have any idea" (Transcript, at 767)) or that any such migration was in fact a "mistake." Indeed, the Court found the scant testimony on these points unconvincing. Again, however, as the Court has concluded that Debtors and the Committee failed to make a prima facie case for consolidation, the issue need not be decided.

**64.** Though not necessary to this decision, the Court notes that the issue of whether D & O insurance policy proceeds are property of the estate (or are otherwise recoverable by a trustee or creditors' committee on behalf of all unsecured creditors) is highly controversial. Depending on the terms of the policy, the proceeds may be entirely payable to third party victims of director or officer misconduct, for defense costs, and for indemnification claims against the estate where applicable, but not to creditors generally. Again, however, the Court need not consider the issue, as there is no evidence in this record of any entitlement to such proceeds.

based in large part on the PwC analysis that assumed WATP ownership of the Master Account.[65] Peltz, on the other hand, assumed New World Access ownership of the Master Account in Scenario II. However, his analysis overstated the assets in a manner similar to that described above in the consolidation context. For example, the $20 million estimate included in the liquidation value of "other causes of action," and based largely on anticipated D & O policy recoveries, is incorporated in Scenario II as an asset of New World Access. In addition, the $23,956,141 in "excess" receivable recoveries (i.e., the portion over and above the Disclosure Statement's $30 million) is also included, but is in effect allocated to the Debtors that hold accounts receivable. No portion of this excess amount is attributable to WATP, since WATP has no receivables in Scenario II. The Court will also assume that no portion of the excess amount is attributable to either the New World Access or WxC receivables, inasmuch as the $5,571,880 shown for New World Access and the $544,850 shown for WxC are, according to Debtors' and the Committee's Demonstrative Exhibit No. 229, owed by non-debtor foreign affiliates and are already net of adjustments for unrecoverable amounts. For purposes of estimating the percentage recoveries in stand-alone liquidations, the excess receivable recoveries will therefore be allocated, as a rough approximation, between WATG and Facilicom in proportion to their respective total recoveries on accounts receivable as shown in Scenario II. Accordingly, the sum of $9,998,575 will be deducted from the WATG receivable recoveries and $13,957,566 from Facilicom.

Further, as discussed *supra,* the $21,131,116 in preference recoveries shown for WATP in Scenario II should be reallocated to New World Access, inasmuch as Scenario II assumes World Access ownership of the account from which the preferential payments were made. *See* n. 17, *supra.* In addition, that figure should be reduced by the estimated preference recoveries from WxC. Of the $140,874,109 in potentially preferential payments identified by PwC as made from the Master Account, $28,641,574 were paid to WxC. The estimated 15% recovery with respect to these payments, i.e., $4,296,236, is included in the $21,131,116 in preference recoveries shown in Scenario II for WATP (and now reallocated to New World Access). As WxC has no funds for distribution to general unsecured creditors in Scenario II, the $4,296,236 should be deducted, leaving a balance of $16,834,880 in estimated preference recoveries for the estate of New World Access.[66]

As for administrative expenses, Peltz reallocates $10,906,534 of the post-petition intercompany overhead charges to WxC, for repayment as an administrative claim. According to Scenario II, however, WxC has only $6,507,648 available to pay $13,646,431 in administrative claims.[67] As-

---

**65.** The Court also notes that while Den Uyl began with the same Disclosure Statement figures for assets and costs that he had used in his consolidation analysis, he then allocated those values and costs among the five Debtors based merely on percentages that he derived from the PwC liquidation analysis. He thereby of necessity adopted the assumptions made by PwC in its report.

**66.** The Court makes no adjustment for any possible deficiency in the estimated preference recoveries from Facilicom that are included in the $21,131,116 figure, inasmuch as any such deficiency would be *de minimus.*

**67.** I.e., after repayment of the $1,673,346 in post-petition intercompany cash transactions, as shown in the second line item of Scenario II.

suming that $5,201,058 of that amount is applied to the repayment of post-petition overhead, the $23,737,593 shown as, in effect, an additional asset for New World Access in Scenario II should be reduced by the sum of $5,705,476 (i.e., the difference between $10,906,534 and $5,201,058).

Further, with respect to "legal/professional/consulting fees" in separate administrations, counsel for the Committee acknowledged that Peltz' $25 million estimate represented a simple multiplication. Moreover, Peltz allocated over 45% of that amount to WATP, notwithstanding his reasoning that the five separate estates would generate aggregate fees equal to five times the cost of a single, consolidated administration. Peltz allocated the first $7 million to WATP on the theory that WATP would be the primary target of litigation concerning, *inter alia,* ownership of the Master Account and fraudulent transfer of the NACT and BATM stock. As discussed above, however, the Court has disposed of the Master Account issues and has thereby eliminated one of the bases for Peltz' allocation of the initial $7 million to WATP. For this reason, and since the Court also believes Peltz' estimate to be excessive in any event, the Court will reduce Peltz' $11,432,264 estimate for WATP professional fees by $3.5 million, or half of the initial $7 million allocated to WATP. Although the resulting estimate for total professional fees, i.e., $21.5 million, is still excessive, it will suffice for purposes of the Court's estimation of percentage recoveries in stand-alone liquidations (particularly since further reductions would only increase the stand-alone recoveries).

After making all of the foregoing adjustments,[68] the net cash available for distribution to unsecured creditors of New World Access is $58,525,836, of WATP $17,427,841, of WATG $2,066,310, of WxC $-0-(i.e., negative), and of Facilicom $8,836,755. Using Peltz' figures for "General Unsecured Claims Excluding Intercompany and Guarantees" (less his reductions for offsetting accounts receivable), the percentage recoveries, prior to consideration of prepetition intercompany claims, for creditors of New World Access would be 15.49%, for WATP 14.37%, for WATG 1.99%, for WxC –0–%, and for Facilicom 15.11%. Accordingly, prior to the intercompany claims analysis, creditors of New World Access, WATP, and Facilicom receive more in stand-alone liquidations than in consolidation.

It was DenUyl's opinion that, for purposes of determining whether holding company creditors (such as $R^2$) receive more in stand-alone liquidations than in consolidation, the intercompany claims analysis could be eliminated from Scenario II. As discussed above, DenUyl relied largely on Dudney's fourth opinion, i.e., that the operating companies were net users of cash, in concluding that a proper intercompany claims analysis (one that, *inter alia,* offset intercompany payables and receivables) would only increase the net distributable cash at the holding company level. DenUyl reasoned that since the holding company creditors receive more in stand-alone liquidations even before consideration of intercompany claims, the intercompany analysis would only magnify that benefit and could therefore be eliminated.

Although Debtors admitted in their opening statement that the operating companies were net users of cash, they urge (in their Proposed Findings) that such Debtors "burned cash" only on a collective

---

68. The Court has made no revisions for changes in U.S. Trustee fees, if any, caused by the adjustments discussed above, as the impact of same would be *de minimus.*

basis. They also assert in this regard that no analysis has been performed to determine whether one or more of the operating Debtors might hold a net claim against the parents, regardless of whether the subsidiaries were net users of cash on a collective basis.

It is true that a parent corporation may be owed money by its subsidiaries collectively, even though one or more of the individual subsidiaries has a net claim against the parent. Indeed, as noted by Debtors and the Committee, the scheduled intercompany claims, which are set forth by Peltz in Scenario II, show (after offsetting and elimination of duplicates) a net claim due from the holding companies to WATG notwithstanding a substantial net claim owed by the subsidiaries collectively.

Debtors and the Committee, in further opposition to elimination of the intercompany claims, urge that a liquidation analysis that fails to consider intercompany claims is meaningless and that the Court would not be free, in the context of stand-alone liquidations of the five estates, to ignore such claims. Again, it is true that in stand-alone liquidations, the intercompany claims could not be ignored. However, the intercompany analysis provided by Debtors and the Committee, through their expert Scott Peltz, is flawed in a number of important respects and fails to comport with the treatment that intercompany claims would actually receive in stand-alone liquidations.

First, Peltz included over $1.5 billion in duplicate intercompany claims, i.e., those asserted by the parent companies against the operating companies and by the operating companies against the parents. He also failed to offset the intercompany claims, thereby further increasing the total claims against each estate and, as explained *supra*, skewing the "reallocation" of assets among the Debtors. It was, of course, in the interest of Debtors and the Committee to use as large a claims base as possible in calculating the recovery percentage for each stand-alone estate. As the recovery percentage represents the ratio of the Debtor's distributable cash to general unsecured claims, a larger claims base (i.e., the denominator) results in a smaller recovery percentage for the estate, making consolidation dividends appear more attractive.

Indeed, Scenario II includes $661 million in purported intercompany claims shown in Debtors' amended schedules as owed to New World Access by WATP. The evidence indicates, however, that there was little, if any, intercompany activity between the two holding companies. Mark Gergel testified, in connection with his discussion of the nature and volume of intercompany transactions among the various entities, that there really were no intercompany transactions between New World Access and WATP. As R[2] has noted, that is not surprising, inasmuch as both are holding companies that would have little reason to interact with one another. In fact, Debtors and the Committee have conceded, based on Gergel's testimony, that there are no intercompany transactions between New World Access and WATP in their Proposed Finding of Fact No. 233.

Debtors and the Committee attempt to retreat from that position in their response to R[2]'s Proposed Finding of Fact No. 141, in which they claim that transfers of funds by New World Access to WATP's *subsidiaries* constitute intercompany transactions between New World Access and WATP. Debtors and the Committee refer to the "Supplemental Answer to Interrogatory No. 6 of Creditor R[2] Investments, LDC's First Set of Interrogatories," a copy of which was offered and received into evidence as R[2] Exhibit No. 642. Interrogatory No. 6 sought identification of

"any and all transfers of assets or liabilities between World Access and WATP," as well as the dates, amounts, business purpose, and other details of each transfer. Debtors, in their Supplemental Answer, objected to this interrogatory as overbroad, but nonetheless responded that the following transfers had been made between New World Access and WATP:

1) World Access transfer of BATM stock ... and NACT stock ... to WATP....

2) Multiple transfers of funds by World Access from Master Account # 3751046297 *to the zero-balance accounts of WATP's subsidiaries.* ... [T]hese transfers occurred in the ordinary course of business on virtually a daily basis....

3) To the extent Master Account # 3751046297 is deemed to be owned solely by WATP, which Debtors dispute, all transfers by World Access into Master Account # 3751046297, ... which include at least the following deposits into Master Account # 3751046297:

- In or around November, 1999: $50,000,000
- In or around December, 1999: $75,000,000
- In or around February, 2000: $83,000,000
- In or around April, 2000: $281,600,000
- In or around June, 2000: $20,000,000

(R [2] Exhibit No. 642) (emphasis added) [69]

As discussed earlier, the five deposits described above, aggregating approximately $500 million, resulted from private placements by New World Access and other financings or sales. Both parties acknowledge that these five deposits only constitute intercompany transfers if WATP is found to own the Master Account. (See R [2] Proposed Finding of Fact No. 141 and Debtor's and the Committee's response thereto.) Inasmuch as the account has been found to be owned by New World Access, these deposits do not constitute intercompany transfers. For the same reason, they do not constitute capital contributions (as alleged by R [2]) made by New World Access to WATP.

The only other intercompany transfers identified in Debtors' Supplemental Answer quoted above, other than the two stock transfers, are the daily transfers of funds by New World Access from the Master Account to the zero-balance accounts of WATP's subsidiaries. Debtors and the Committee state, in their response to R [2] Proposed Finding of Fact No. 141:

These transfers of funds to WATP's subsidiaries are intercompany transactions between World Access and WATP regardless of which entity owns the [master] account.... In fact, the obligations relating to these transactions are set forth in the list of liabilities set forth in WATP's schedules (DX 43).

The referenced exhibit ("DX 43") is an amendment to WATP's schedules filed on December 18, 2001. The obligations relating to the transfers from the Master Account to the zero-balance accounts of WATP's subsidiaries are listed therein as a debt owed by WATP to New World Access in the amount of $661,206,343, i.e., the amount shown in Scenario II as an intercompany claim against WATP. There is nothing, however, in the record to support the contention that obligations arising from the transfer of funds by New World

69. Debtors also stated that they would produce documents, "including voluminous financial, business and operational records" from which responsive information could be ascertained.

Access to *subsidiaries* of WATP constitute obligations of *WATP*. Not surprisingly, no guaranty has been introduced evidencing an obligation owed by WATP to its own parent holding company of the debts of its subsidiaries. Without such a guaranty or similar commitment, the amount shown in the schedules amendment as due from WATP would actually be owed only by WATP's subsidiaries. Accordingly, other than the two transfers of stock, Debtors failed to identify in their Supplemental Answer any intercompany transfers between New World Access and WATP.

Finally, Peltz' intercompany claims methodology suffers from a further flaw. As discussed above, he "reallocated" the assets among the various Debtors by deriving initial recovery percentages for each estate and then using those percentages to calculate and pay the intercompany dividends. Peltz then added those dividends to (or, where the net intercompany dividend was negative, subtracted the dividend from) the net distributable cash in the respective estates to arrive at new figures for net distributable cash. Using these revised cash figures, Peltz calculated for each Debtor a revised recovery percentage. He then accounted for payments on guarantees to arrive at final recovery percentages.

Peltz' method is flawed because it is premised on an initial distribution of cash made only to intercompany creditors, and not to unsecured creditors generally. His analysis, in effect, postpones the payments to general unsecured creditors until after intercompany dividends are paid. This method results in payment of a different percentage to intercompany creditors (in some cases more) than to other general unsecured creditors.

For example, in the New World Access case, Peltz calculates dividends to intercompany creditors based on an initial re-

covery percentage of 5.859%. However, since New World Access pays out more on intercompany claims than it receives, the final recovery percentage for unsecured creditors is estimated at only 4.045%.

Although Peltz may have been using this "reallocation" of assets as merely an estimation device, it does not provide a reliable estimate. The initial recovery percentage for each estate, which Peltz used only to calculate the intercompany dividends, actually represents the minimum that all of the unsecured creditors would receive from the estate. That initial percentage would then be augmented by additional recoveries achieved through supplemental distributions of the intercompany dividends received from other estates.

Although Debtors and the Committee, for all of these reasons, have failed to provide a reliable intercompany analysis, the Court has estimated the effect of a proper intercompany analysis using the intercompany claims shown in Scenario II as a starting point. First, the Court has assumed that the identical claims asserted by and against New World Access and WATP are claims by and against New World Access, as owner of the Master Account. Next, the Court has offset the various intercompany payables against the receivables. The resulting intercompany claims include net claims of $234,141,322 owed by Facilicom to New World Access, $75,739,763 owed by New World Access to WATG, $47,941,339 owed by WATG to Facilicom, and several claims owed by WxC which need not be considered here, as there are no assets to pay them. In addition, for the reasons discussed above, the Court has eliminated the intercompany claims between New World Access and WATP for purposes of this estimate.

Using the revised figures derived above for net distributable cash, i.e., $58,525,836 for New World Access, $17,427,841 for

WATP, $2,066,310 for WATG, –0–for WxC, and $8,836,755 for Facilicom, the Court has calculated the recovery percentages for each estate. In so doing, the Court has divided those cash figures by the sum (for each estate) of (i) Peltz' figures for "General Unsecured Claims Excluding Interco. & Guarantees," (ii) the revised intercompany claims listed above, and (iii) applicable intercompany guaranties.[70] The resulting recovery percentages, prior to distribution of funds received as intercompany dividends, are 9.77% for New World Access, 14.37% for WATP, 1.36% for WATG, –0–% for WxC, and 3.02% for Facilicom. The recovery percentages for New World Access, WATG, and Facilicom would then increase upon distribution of the intercompany dividends. The first round of intercompany dividends to be distributed would include $7,071,068 by New World Access (received from Facilicom), $7,399,775 by WATG (received from New World Access), and $652,002 by Facilicom (received from WATG). The recovery percentages for this first supplemental distribution (calculated using the same claims denominator as in the first distribution) would be 1.18% for New World Access, 4.88% for WATG, and .22% for Facilicom, resulting in aggregate recovery percentages of 10.95% for New World Access, 6.24% for WATG, and 3.24% for Facilicom. Although additional supplemental distributions would further increase these recovery percentages (since intercompany dividends are paid each time a supplemental distribution is made), these calculations will suffice for purposes of the Court's estimation, as it is clear that even without

such further increases the creditors of both WATP and New World Access obtain greater recoveries in stand-alone liquidations than in consolidation. Indeed, R[2] alone would receive over $15,601,759 in stand-alone liquidations (i.e., $5,699,475 from New World Access on its Senior Notes claim, $5,992,290 from WATP on its Convertible Notes claim, and $3,909,994 from New World Access on the guarantee[71] of the Convertible Notes claim) and only $10,162,500 in consolidation.

Inasmuch as Debtors and the Committee have failed to establish a prima facie case of substantial identity between the entities and necessity of consolidation to avoid harm or realize benefit, the Court need not consider whether the reliance and prejudice prongs of the *Eastgroup* test are met.

**Application of Augie/Restivo.**

■■■ As for *Augie/Restivo*, it is clear from the discussion above that the second of the "two critical factors" identified by the Court, i.e., "whether the affairs of the debtors are so entangled that consolidation will benefit all creditors," has not been established. For the same reasons that Debtors and the Committee failed to establish a prima facie case that consolidation was necessary to avoid the harm of disentangling the Debtors' affairs, they have failed to establish the degree of entanglement required to warrant consolidation under *Augie/Restivo*.

As for the other critical factor of *Augie/Restivo*, Debtors and the Committee have failed to establish that "creditors

---

**70.** The Court has included the guarantees at full face value in the estate of the guarantor, even though some distribution would be made on the guaranteed claim by the estate of the primary obligor (except in the case of WxC). This method will suffice for purposes of the Court's estimation, inasmuch as reduction of the guarantees by the estimated distributions

on the primary claims would only decrease the claims base in the guarantor's estate, thereby increasing its stand-alone recovery percentage.

**71.** Calculated on the unpaid balance remaining after distribution by WATP.

dealt with the entities as a single economic unit and 'did not rely on their separate identity in extending credit.'" *Augie/Restivo*, 860 F.2d, at 518. First, as discussed above in connection with the "substantial identity" determination under *Eastgroup*, the evidence fails to show that Debtors' vendors dealt with them as a single economic unit. Again, AT & T separately invoiced WxC and other members of the World Access group and continued to separately track telecommunications services usage even after it began mailing all the invoices to WxC for processing. WorldCom maintained separate contracts and separate invoicing accounts for the operating Debtors and billed them separately. Indeed, WorldCom would not operate under the new consolidated service agreements unless New World Access guaranteed WxC's obligations thereunder. Further, the buying consortium letter sent to WorldCom and the Debtors' other vendors emphasized and reinforced that each of the entities would "continue to be solely responsible" for their own debts.

The evidence concerning the holders of Senior and Convertible Notes similarly fails to establish that they dealt with the Debtors as a single economic unit and did not rely on their separate identity in extending credit. First, Wendy Landon, vice president of DDJ, purchased Senior Notes in January of 2001 because the price at which they were trading was significantly below the tender offer price and because she believed that sufficient cash resided at the New World Access level to complete the proposed tender. She knew that the indenture contained provisions requiring New World Access to tender for Senior Notes upon receipt of certain asset sale proceeds. She had reviewed the September 30, 2000 10Q report and ascertained, *inter alia*, that there was substantial cash shown on the consolidated financial statements. She believed, based on her review of those statements and a judge's ruling that the tender by New World Access was legally required, that the substantial cash necessary to complete the tender was in fact held at the New World Access level.

Accordingly, Landon made DDJ's investment decision in reliance on the fact that the cash was held by New World Access. Indeed, Debtors and the Committee have specifically acknowledged, in their Proposed Finding of Fact No. 281, that Landon based DDJ's January 2001 decision to invest in the Senior Notes on the fact that the cash was held at the New World Access level.[72]

DDJ's purchase in April 2001 of WATP's Convertible Notes is consistent with this conclusion and further underscores Landon's ongoing awareness that DDJ was dealing with separate corporate entities and separate pools of assets. As indicated above, Landon purchased the Convertible Notes almost two months after her last pre-bankruptcy purchase of Senior Notes.

---

**72.** Debtors and the Committee state in their Proposed Finding of Fact No. 281 as follows:
[A]fter reviewing the public financial statements for World Access in January 2001, DDJ Capital Management LLC ("DDJ") concluded that World Access held its cash at the World Access level. As Wendy Landon of DDJ testified during her deposition, DDJ examined the World Access 10Q in January 2001 and based its investment decision on the fact that these financial statements demonstrated that World Access'
cash was held at World Access, Inc. (See Landon Dep. at 25–26.) . . .

As indicated above, the Court agrees that Landon acted in reliance on her conclusion that New World Access held the cash required for the tender. She did not, however, come to this conclusion based solely on her review of the third quarter 10Q report, but on a combination of factors, including the information shown in that report and the judge's ruling that the tender was required.

She bought them as a "hedge," because it was her impression that R²'s representative William Holloway "really believed that the convertible notes were senior." (Landon Deposition, at 73) The Convertible Notes, which were not senior by contract and were actually entitled "4.5% Convertible Subordinated Notes Due 2002," could only have been "senior" to the New World Access Senior Notes in a structural sense. In other words, if most of the cash in the corporate group was located at WATP, then the holders of Convertible Notes would have a prior claim to it; holders of Senior Notes would only have a claim derivatively through New World Access, as shareholder of WATP, to any amounts remaining after satisfaction of the claims of WATP's creditors.

Again, Landon had purchased Senior Notes in January and February believing that much or all of the cash was housed at New World Access. She characterized her purchase of the Convertible Notes in April as a "hedge," because it was a hedge against the possibility that the cash was actually housed at WATP. The Convertible Notes were trading at less than ten percent of face amount, and she thought, "... you know what? If [Holloway] believes it, we should probably buy this as a hedge because there's ... not much down side." (Landon Deposition, at 73) She was not relying on the cash actually being housed at WATP; she was merely hedging against that possibility because the price was so low. Again, her decision to purchase the Convertible Notes further underscores her awareness that DDJ was dealing with separate corporate entities. If Landon thought that the Convertible Notes would be paid from the same pool of assets as the Senior Notes, the April purchase of Convertible Notes would not have been a "hedge."[73]

Debtors and the Committee not only acknowledge that DDJ's decision to invest in the Senior Notes was based on the fact that the cash was held by New World Access, but they also go on to assert that R² did not assess its risk any differently. While that may be an overstatement, the Court agrees that R² also believed, at the very least at the time of its Senior Notes purchases in October, 2000, that substantial cash, sufficient to complete the proposed tender, was housed at the New World Access level. As discussed above, R² portfolio manager Mark Horrell summarized all the information that he obtained through his research and investigation and communicated the important information to Geoffrey Raynor, the ultimate decision-maker. Horrell had acquired important information concerning sizeable amounts of cash held at the New World Access level, including the proceeds of substantial equity financings. Horrell gathered this information and conveyed it to Raynor.[74]

In addition, Raynor and Horrell attended the meeting with World Access repre-

---

**73.** The Court rejects, however, R²'s contention that because New World Access was already in bankruptcy at the time Landon purchased the Convertible Notes on April 12, 2001, she was attempting by that purchase "to offset [DDJ's] investments in World Access, Inc. with an investment in another, healthier company: WATP." R² Response to Debtors' and the Committee's Proposed Finding of Fact No. 270. DDJ specialized in distressed and high yield investing, including bankrupt companies. Landon did not pur-

chase the Convertible Notes on April 12 because she thought WATP would never file bankruptcy; she bought them as a hedge against the possibility that WATP might actually be the entity where most of the cash was housed.

**74.** The Court makes this finding based not only on the fact that Horrell always communicated the important information about proposed investments to Raynor but also on Raynor's testimony that it was his standard operating procedure to inquire about cash

sentatives in Atlanta in December, 2000, at which both the tender and the current and anticipated cash balances were discussed. At that time, R $^2$ had suspended its purchases of Senior Notes because an issue had arisen as to whether the tender would actually go through. R $^2$ did not resume its purchases of Senior Notes until January, 2001.[75] R $^2$, dubbed by Debtors and the Committee a "sophisticated, well-heeled investor," made these purchases in order to profit upon consummation of the tender; it is therefore not surprising that R $^2$ gathered and relied upon information concerning the cash available to consummate that tender at the level of the entity legally required to do so.

Debtors and the Committee, while acknowledging that these investors made their decisions to purchase Senior Notes in reliance on adequate cash at the New World Access level, do not regard that reliance as reasonable. According to their expert, Professor Gilson, a reasonable investor would have performed a discounted cash flow analysis before making such an investment decision. However, while Gilson testified that the discounted cash flow method is widely used by investment bankers, hedge fund managers, mutual funds, pension funds, and other investors, the evidence does not establish that investors in notes such as those involved here always or even customarily make their decisions based on that method. In this case alone, decisions appear to have been made by experienced investment professionals on the basis of other types of information. Without more compelling evidence of the actual practice in the industry, the Court declines to adopt a standard that could render many investment decisions of this nature *per se* unreasonable.

As for the Convertible Notes, the Court finds that R $^2$'s purchases, at least those made in 1999 after his visit to World Access headquarters in Atlanta, were made in reliance on the separate identity or credit of WATP. Again, Horrell was aware of substantial amounts of cash at both the New World Access and WATP levels. He left the August, 1999 visit with the understanding that there was approximately $65 million in cash housed at WATP. Horrell testified that this information was important to the purchase of additional Convertible Notes, and he communicated the information to Raynor.[76]

In light of all the foregoing, the Court concludes that the evidence fails to establish that creditors dealt with the Debtors as a single economic unit and did not rely on their separate identity in extending credit.[77]

**Conclusion.**

As indicated above, the purpose of substantive consolidation is to ensure the equi-

---

levels when consulting with Horrell (and R $^2$'s other investment professionals).

**75.** The issue of R $^2$'s reliance as to the January and February purchases of Senior Notes need not be decided. However, the Court notes that although Horrell had left R $^2$ on January 6, 2001 and was not then recommending further purchases of either series of notes, Raynor testified that he was still relying on Horrell's "work," which would have included the information previously provided by Horrell, such as the substantial cash balances held at the New World Access and WATP levels. In addition, Raynor had discussed current and anticipated cash balances at the December meeting in Atlanta with World Access representatives.

**76.** He also, as indicated above, transmitted to Raynor a copy of the typed version of his notes from the August 1999 meeting at World Access headquarters, R $^2$ Exhibit 167.

**77.** Under the circumstances, the Court need not reach the issue of whether Daiwa relied on the separate identity or separate credit of WATP or whether R $^2$ relied on it as to its later purchases of Convertible Notes. In particular, the Court need not decide whether any reliance by R $^2$ in April, 2001 on the

table treatment of all creditors. It is the Court's judgment that under the facts presented in this case, consolidation will not serve that purpose. Accordingly, the motion for substantive consolidation will be denied.

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. Pursuant to Federal Rule of Bankruptcy Procedure 9021, a separate order will be entered denying the Motion for Substantive Consolidation of Debtors' Estates filed jointly by Debtors and the Committee. In addition, for all the reasons stated above, a separate judgment will be entered in Adversary Proceeding No. 01 A 01219 in favor of $R^2$ on Count I of its Second Amended Complaint and against $R^2$ on Counts II and III thereof.

separate identity or credit of WATP, in connection with $R^2$'s purchases of Convertible Notes for pennies on the dollar after the involuntary petition against New World Access and days before the voluntary petitions in this Court, gives rise to any "significant equities" within the meaning of *Augie/Restivo.*